MARTHA CRAIG DAUGHTREY, Circuit Judge.
*558 Neil A. Morgan II and Anita L. Graf sued Fairfield County, Ohio, three of its officials, and five members of its sheriff's department under 42 U.S.C. § 1983, claiming Fourth Amendment violations. Specifically, Morgan and Graf alleged that individual officers of the county's SCRAP unit-Street Crime Reduction and Apprehension Program-violated their Fourth Amendment rights when they surrounded Morgan's and Graf's house, without a warrant or exigent circumstances, in order to perform a 'knock and talk.'[1] They also claimed that the county violated their Fourth Amendment rights by making such illegal entries of property a policy or practice. The district court granted the defendants' motion for summary judgment in full. The district court was correct to conclude that the law was not clearly established, so that the claims against the individual officers failed on qualified immunity grounds. The district court was wrong, however, to conclude that the county was not liable for injuries caused by a policy that directed officers to make warrantless entries onto constitutionally protected property with no regard for-or even recognition of-constitutional limits. For these reasons, we affirm in part and reverse in part.
BACKGROUND
Morgan and Graf owned a home together on about a one-acre lot. The front of the house faced the road, and a sidewalk ran from the road to their front door. In the front window and on a vehicle parked on the property were no-trespassing signs. There were neighboring homes-each approximately 300 feet away. At the time of the events of this case, one of the neighboring houses was occupied; the other was empty. There were only limited sightlines between the houses and no residences across the street or behind Morgan's and Graf's house.
In the back of the house there was a second-story balcony that was not visible from the front of the residence. There were no stairs to the balcony, so that the only way to access it was through the house. On one side of the balcony was a privacy fence, blocking the view to the one neighbor's house that was occupied. On the other side, large trees blocked the view to the unoccupied neighboring house.
The county's SCRAP unit received two anonymous tips that Morgan and Graf were growing marijuana and cooking methamphetamine at their house. The SCRAP unit was familiar with Morgan and Graf; they had conducted a 'knock and talk' a year earlier and let Morgan and Graf off with a warning. The two new tips were not sufficient to establish probable cause for a warrant, however, and so the SCRAP unit decided to do another 'knock and talk.'
Five members of the SCRAP unit went to the house and, following their standard practice, surrounded the house before knocking on the door. One officer was stationed at each corner of the house, and *559 one approached the front door. The officers around the perimeter were standing approximately five-to-seven feet from the house itself. The officers forming the perimeter could see through a window into the house on at least one side of the building.
With the officers in position, the officer at the front door-Deputy Lyle Campbell-knocked and spoke briefly with Graf. Graf shut the door, remaining inside.[2] While Campbell was speaking with Graf, one of the officers positioned in the back of the house noticed seven marijuana plants growing on the second-floor back balcony and notified the other members of the SCRAP unit. By the time Campbell learned of the plants, Graf already had closed the front door. Fearing destruction of evidence, Campbell then demanded that Graf return and open the door. Almost immediately after voicing that demand, he opened the door, entered the house, and brought Morgan and Graf outside to wait for a search warrant.
An Ohio court issued a search warrant based on the officers' observation of the marijuana plants. During the ensuing search, the police found weapons, drugs, and drug paraphernalia. Morgan and Graf were arrested and charged in state court. The trial court denied Morgan's and Graf's suppression motion, after which Morgan pleaded guilty and Graf was found guilty by a jury. On appeal, however, the denial of the suppression motion was overturned and the convictions vacated. The State of Ohio subsequently dropped the charges.
The proceedings below
After the dismissal of the charges, Morgan and Graf filed this 42 U.S.C. § 1983 action, alleging violations of their Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures. They sued four members of the SCRAP unit in both their individual and official capacities, and they sued two Fairfield County commissioners and the Fairfield County sheriff in their official capacities. They also sued the county itself.
Morgan and Graf alleged that forming a perimeter around the house intruded on their curtilage, an area protected by the Fourth Amendment. What is more, the intrusion was not a one-time event-it was the county's policy to do so during every 'knock and talk.' On cross-motions for summary judgment, the district court dismissed all of the claims.
First, addressing the claims against the officers in their individual capacities, the district court concluded that the officers were entitled to qualified immunity. Specifically, the court held, qualified immunity was appropriate because even if intruding onto the curtilage violated the Fourth Amendment, it was not clearly established that such an action was a violation at the time of the 'knock and talk'-June 19, 2012. The district court relied on the unpublished decision in Turk v. Comerford , 488 F. App'x 933 (6th Cir. 2012), which this court had issued a month after the 'knock and talk' incident at issue here. In Turk , police had surrounded a home for a 'knock and talk' because they believed that a dangerous fugitive was inside. Id. at 935. The Turk panel looked to the opinion in Hardesty v. Hamburg Township , 461 F.3d 646 (6th Cir. 2006), which recognized that curtilage gets Fourth Amendment protection but concluded that officers may intrude on curtilage to look for someone during a *560 'knock and talk' if they have indications that someone is inside and just not answering the door. Because it was unclear whether the logic of Hardesty applied to surrounding a house "with no warrant, exigent circumstances, or consent," the panel in Turk concluded that the police were entitled to qualified immunity. 488 F. App'x at 947-48. Relying on Turk , the district court here concluded that if the law was not settled in July 2012, it was not settled in June 2012. Thus, the district court reasoned, the officers were entitled to qualified immunity.
Next, the district court addressed the official-capacity claims and the claim against the county-correctly analyzed as one claim against Fairfield County-and concluded that Morgan and Graf could not meet the standard for municipal liability required by Monell v. Department of Social Services , 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The court noted that Morgan and Graf could not show that the policy was facially unconstitutional because there could be instances in which the policy would be applied constitutionally. Nor, said the district court, could they satisfy the burden of showing that the county was deliberately indifferent to unconstitutional application of its policy. The district court thus granted summary judgment in favor of all of the defendants on all claims.
DISCUSSION
Standard of review
This court reviews a grant of summary judgment de novo . Daughenbaugh v. City of Tiffin , 150 F.3d 594, 597 (6th Cir. 1998). "In the qualified immunity context, 'this usually means adopting ... the plaintiff's version of the facts,' unless the plaintiff's version is 'blatantly contradicted by the record, so that no reasonable jury could believe it.' " Stoudemire v. Mich. Dep't of Corr. , 705 F.3d 560, 565 (6th Cir. 2013) (alteration in original) (quoting Scott v. Harris , 550 U.S. 372, 378, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ). Summary judgment is appropriate only if there is no genuine dispute of material fact. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if its resolution will affect the outcome of the lawsuit. Id. at 248, 106 S.Ct. 2505.[3]
Qualified immunity
Government officials sued in their individual capacities for constitutional violations are free from liability for civil damages unless (1) they violate a constitutional right that (2) was clearly established at the time that it was violated. See Harlow v. Fitzgerald , 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Courts can address these two elements in any order. Pearson v. Callahan , 555 U.S. 223, 236-37, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). And although this decision turns on the second element-whether the law was clearly established-we have the ability, if not the responsibility, to clarify the state of the law in this circuit so that government agents can understand the limits of their power and that citizens will be protected when those limits are transgressed. For that reason, we address both parts of the qualified-immunity analysis.
Fourth Amendment violation
"It is well settled" under the Fourth Amendment that a warrantless *561 search is " 'per se unreasonable ... subject only to a few specifically established and well-delineated exceptions.' " Schneckloth v. Bustamonte , 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (alteration in original) (quoting Katz v. United States , 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ). That raises two questions: did the SCRAP unit search Morgan's and Graf's property and, if so, did that search fall under one of the exceptions to the warrant requirement?
The answer to the first question is yes, the SCRAP unit searched the property for Fourth Amendment purposes. When the government gains information by physically intruding into one's home, " 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.' " Florida v. Jardines , 569 U.S. 1, 5, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) (quoting United States v. Jones , 565 U.S. 400, 406 n.3, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) ). But it is not just the physical house that receives the Amendment's protection. The curtilage-the area "immediately surrounding and associated with the home"-is treated as "part of [the] home itself for Fourth Amendment purposes." Oliver v. United States , 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). That is because " '[t]he protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened.' " Collins v. Virginia , --- U.S. ----, 138 S.Ct. 1663, 1670, 201 L.Ed.2d 9 (2018) (quoting California v. Ciraolo , 476 U.S. 207, 212-13, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) ).
Whether a part of one's property is curtilage generally involves a fact-intensive analysis that considers (1) the proximity of the area to the home, (2) whether the area is within an enclosure around the home, (3) how that the area is used, and (4) what the owner has done to protect the area from observation by passersby. United States v. Dunn , 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). But these factors are not to be applied mechanically: they are "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration-whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id. at 301, 107 S.Ct. 1134. Often that central consideration requires little more than a commonsense analysis because the concept is "familiar enough that it is 'easily understood from our daily experience.' " Jardines , 569 U.S. at 7, 133 S.Ct. 1409 (quoting Oliver , 466 U.S. at 182 n.12, 104 S.Ct. 1735 ).
Under that commonsense approach, the area five-to-seven feet from Morgan's and Graf's home was within the home's curtilage. Even when the borders are not clearly marked, it is "easily understood from our daily experience" that an arm's-length from one's house is a "classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.' " Id. (quoting Oliver , 466 U.S. at 182 n.12, 104 S.Ct. 1735 ). The right to be free of unwarranted search and seizure "would be of little practical value if the State's agents could stand in a ... side garden and trawl for evidence with impunity." Id. at 6, 133 S.Ct. 1409. And the right to privacy of the home at the very core of the Fourth Amendment "would be significantly diminished" if the police-unable to enter the house-could walk around the house and observe one's most intimate and private moments through the windows. Id.
But not only were the SCRAP unit members positioned on the sides of the house, they were in the backyard, too. Indeed the backyard is where they discovered *562 the marijuana plants, the cause of the injuries alleged by Morgan and Graf. And "the law seems relatively unambiguous that a backyard abutting the home constitutes curtilage and receives constitutional protection." Daughenbaugh , 150 F.3d at 603 ; see also United States v. Jenkins , 124 F.3d 768, 773 (6th Cir. 1997). That is true especially when, as here, there are no neighbors behind the house and the backyard is not visible from the road.
The county mistakenly focuses its application of the Dunn analysis on the backyard balcony itself, arguing that the there is no search because the balcony was not part of the curtilage. But even if the county were correct that a backyard, second-story balcony with no outside access was not part of the curtilage, it would make no difference here, because the balcony is not what is at issue. The curtilage that the officers are said to have entered is the area surrounding the house, five-to-seven feet from the residence. Regarding that area, the county argues only two points-first that the immediate perimeter surrounding the house was not part of the curtilage because there was no fence enclosing the rear or perimeter of the house and, second, that area was not part of the curtilage because Morgan and Graf had neighbors. Those arguments are belied, however, by Dunn and Jardines and the "relatively unambiguous" conclusion this court came to 20 years ago in Daughenbaugh .
Because the area surrounding Morgan's and Graf's house was curtilage, and curtilage is treated as part of the home for Fourth Amendment purposes, the officers' entry onto the curtilage could be justified only by a warrant or one of the recognized exceptions to the warrant requirement. It is undisputed that the SCRAP unit had no warrant. As for exceptions to the warrant requirement, the county argues that the entry was justified for three reasons. None, however, is convincing.
First, the county argues that forming a perimeter was not unconstitutional because the officers were protecting their own safety. To be sure, officer safety can be an exigency justifying warrantless entry. But "[q]ualification for this exception is not easy" and requires a particularized showing of a risk of immediate harm. United States v. Purcell , 526 F.3d 953, 960 (6th Cir. 2008). The only particularized facts that the county offers here are a contested fact, i.e. , that Morgan was in a motorcycle gang, and a fact with no citation to the record, i.e. , that Morgan may have had a weapon. Without more, the county cannot show "the need for prompt action by government personnel" required to conclude that delay to obtain a warrant "would be unacceptable under the circumstances." Id. (quoting United States v. Rohrig , 98 F.3d 1506, 1517 (6th Cir. 1996) ).
Instead of showing a particular and immediate risk, the county argues that concern for officer safety generally allows police to enter the curtilage and form a perimeter. Yet rather than citing a case supporting that position, the county argues that drugs and guns often go together. Maybe. But that is no more than a general statement of correlation; and generic possibilities of danger cannot overcome the required particularized showing of a risk of immediate harm. See id. at 961. But, even if the officers knew that Morgan had a weapon, "[t]he mere presence of firearms does not create exigent circumstances." United States v. Johnson , 22 F.3d 674, 680 (6th Cir. 1994).
What is more, the county's position would create an exception that would swallow the rule. It might be safer for the police to enter the curtilage to form a perimeter; it would certainly be easier to *563 stop someone who might flee by establishing some sort of barrier to that flight. Indeed, many (if not most) Fourth Amendment violations would benefit the police in some way: It could be safer for police without a warrant to kick in the door in the middle of the night rather than ring the doorbell during the day, and peering through everyone's windows might be a more effective way to find out who is cooking methamphetamine (or engaging in any illegal behavior, for that matter). But the Bill of Rights exists to protect people from the power of the government, not to aid the government. Adopting defendants' position would turn that principle on its head.
Next, the county argues that the officers' presence in the backyard was not a search because they were not there for the purpose of executing a search. Jardines forecloses that argument. The subjective intent of officers is irrelevant if a search is otherwise objectively reasonable, but subjective intent cannot make reasonable an otherwise unreasonable intrusion onto a constitutionally protected area. See Jardines , 569 U.S. at 10, 133 S.Ct. 1409. Notably, the county does not attempt to distinguish Jardines -in fact it fails to cite it altogether.
Finally, the county argues that the marijuana plants were discovered in plain view. It is a long-standing rule that police do not conduct a search under the Fourth Amendment by seeing something that is in plain view. After all, the Fourth Amendment does not require police to "shield their eyes when passing by a home on public thoroughfares." Ciraolo , 476 U.S. at 213, 106 S.Ct. 1809. The plain-view exception, however, applies only when "the officer did not violate the Fourth Amendment in arriving at the place where the evidence could be plainly viewed." United States v. Taylor , 248 F.3d 506, 512 (6th Cir. 2001). As explained above, the SCRAP unit discovered the marijuana only after entering Morgan's and Graf's constitutionally protected curtilage. The plain-view exception does not apply.
The SCRAP unit was concerned about general drug activity at Morgan's and Graf's house. But the Fourth Amendment prohibited them from entering the property: they had no warrant, no exigent circumstances, and no other exception to the warrant requirement. A 'knock and talk' by police was permitted "precisely because that is 'no more than any private citizen might do.' " Jardines , 569 U.S. at 8, 133 S.Ct. 1409 (quoting Kentucky v. King , 563 U.S. 452, 469, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) ). Thus, the officers' right to enter the property like any other visitor comes with the same limits of that "traditional invitation": "typically ... approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id. Certainly, "[a] visitor cannot traipse through the garden, meander into the backyard, or take other circuitous detours that veer from the pathway that a visitor would customarily use." Id. at 19, 133 S.Ct. 1409 (Alito, J., dissenting). Neither can the police. By doing so here, the SCRAP unit violated Morgan's and Graf's Fourth Amendment rights.
Clearly established law
Whether the law in this area was clearly established at the time of defendants' actions presents a closer question. "A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." United Pet Supply, Inc. v. City of Chattanooga , 768 F.3d 464, 478 (6th Cir. 2014) (brackets omitted) (quoting *564 Plumhoff v. Rickard , --- U.S. ----, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014) ).
In determining the contours of the right, there is a tension between defining the right at too high a level of generality, on one hand, and too granular a level, on the other. There does not need to be "a case directly on point, but existing precedent must have placed the ... constitutional question beyond debate." Ashcroft v. al-Kidd , 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). "The general proposition ... that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Id. at 742, 131 S.Ct. 2074. Nevertheless, "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.' " United States v. Lanier , 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (alteration in original) (quoting Anderson v. Creighton , 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ). In all, the most important question in the inquiry is whether a reasonable government officer would have "fair warning" that the challenged conduct was illegal. Baynes v. Cleland , 799 F.3d 600, 612-13 (6th Cir. 2015) (quoting Hope v. Pelzer , 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ).
For centuries, the common law has protected the curtilage of the house. See Oliver , 466 U.S. at 180, 104 S.Ct. 1735. And the Supreme Court long has held that the curtilage is "considered part of the home itself for Fourth Amendment purposes." Id. That means that the police can enter the curtilage on the same terms that they can enter the rest of the home-no more, no less. See King , 563 U.S. at 469, 131 S.Ct. 1849. Under those long-settled principles, warrantless searches "are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." Katz , 389 U.S. at 357, 88 S.Ct. 507 (footnotes omitted). A reasonable officer thus would understand that without a warrant or an exception to the warrant requirement, entering the curtilage violates a clearly established right.
Despite these long-settled standards, one case from this circuit, although incorrectly decided, requires that we grant qualified immunity. That case, Turk v. Comerford , decided within a month of the 'knock and talk' in this case, found that the law was not clearly settled against a factual background that was, in every material way, the same as here. 488 F. App'x at 947-48.
Central to Turk 's analysis was our published decision in Hardesty , in which we held that "[if] knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage." 461 F.3d at 654. Hardesty 's extension of the knock-and-talk doctrine was, by its terms, limited to particular circumstances. Id. And if our case law ended there, qualified immunity here would be improper. But in Turk , this court read Hardesty more broadly and reasoned that because some limited intrusions of the curtilage were allowed, it was not clearly established that surrounding a house for a 'knock and talk' was in the category of unacceptable intrusions. 488 F. App'x at 947-48.
Although Hardesty and Turk are outliers, Morgan and Graf cannot overcome their burden of showing that the law *565 was clearly established at the time of the search in this case. In those two cases, this court should have reaffirmed long-settled Fourth Amendment principles. Cf. Rogers v. Pendleton , 249 F.3d 279, 289-90 (4th Cir. 2001) (denying qualified immunity and reasoning that allowing access to curtilage based on reasonable suspicion would "eviscerate the principle of Oliver and Dunn that the curtilage is entitled to the same level of Fourth Amendment protection as the home itself"). But it did not. And although unpublished cases do not upset the state of the law, in rare instances they can show that members of this court, during the same time period, facing the exact same question, did not think the law to be clearly established. And "[i]f judges ... disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." Wilson v. Layne , 526 U.S. 603, 618, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). For that reason we affirm the district court's grant of qualified immunity to the officers in their individual capacities.
Nevertheless, in light of recent Supreme Court decisions, neither Hardesty nor Turk remains good law. See, e.g. , Ahearn v. Jackson Hosp. Corp. , 351 F.3d 226, 234-35 (6th Cir. 2003). Jardines and, more recently, Collins made clear that, outside of the same implied invitation extended to all guests, if the government wants to enter one's curtilage it needs to secure a warrant or to satisfy one of the exceptions to the warrant requirement. See Jardines , 569 U.S. at 7-8, 133 S.Ct. 1409. Our acknowledgment that those cases are no longer good law does not affect the qualified-immunity analysis here, which looks to the law at the time of the challenged action. See Harlow , 457 U.S. at 818, 102 S.Ct. 2727. But it does put officers on notice that principles of Jardines and Collins -and not Hardesty or Turk -should guide their actions going forward.
Municipal liability
The district court erred in granting summary judgment in favor of the county and county officials, however. A municipality is a "person" under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible. Monell , 436 U.S. at 690, 98 S.Ct. 2018. The scope of that responsibility does not include respondeat superior liability: a municipality is liable only for its own wrongdoing, not the wrongdoings of its employees. Baynes , 799 F.3d at 620. The upshot is that municipalities can be held liable for harms caused by direct actions of the municipalities themselves, see Pembaur v. City of Cincinnati , 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), harms caused by the implementation of municipal policies or customs, see Garner v. Memphis Police Dep't , 8 F.3d 358, 364 (6th Cir. 1993), and harms caused by employees for whom the municipality has failed to provide adequate training, see Arrington-Bey v. City of Bedford Heights , 858 F.3d 988, 995 (6th Cir. 2017), cert. denied , --- U.S. ----, 138 S.Ct. 738, 199 L.Ed.2d 605 (2018).
Each of these different approaches to liability requires a different analysis. But each approach seeks to answer the same fundamental question: did the municipality cause the harm or did an individual actor? When the injury is a result of an action of an employee who has not been trained properly, we apply "rigorous requirements of culpability and causation"-holding a municipality liable if it has been deliberately indifferent to constitutional rights. Arrington-Bey , 858 F.3d at 995 (quoting Board of County Com'rs of Bryan County v. Brown , 520 U.S. 397, 415, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ). On the other end of the spectrum, when an act of the municipality itself causes the injury, "fault and causation obviously apply."
*566 Id. at 994. Likewise, when an injury is caused by the straightforward carrying out of a municipal policy or custom, the determination of causation is easy. See Garner , 8 F.3d at 364-65.
Although Garner has been the law in this circuit since 1993, we have developed an additional strand of case law analyzing municipal liability for policies or customs. In Gregory v. City of Louisville , 444 F.3d 725, 752 (6th Cir. 2006), we concluded that if a challenged policy is facially constitutional, the plaintiff must show that the policy shows a deliberate indifference to constitutional rights. Id. Thus, Gregory analyzed failure-to-train claims and challenges to facially constitutional municipal policies under the same standard. But as we held in Garner , and recently reaffirmed in Arrington-Bey , "[t]here are important differences between these types of claims" and so we must analyze them differently. Arrington-Bey , 858 F.3d at 994. That means that we must be careful not to apply Gregory too broadly. Gregory may help to determine municipal liability when an employee's interpretation of a policy causes harm. But that is not the case here. Like Garner , this case presents a straightforward challenge to the county's policy itself. And, as in Garner , we apply a straightforward test: Morgan and Graf must "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that [their] particular injur[ies] [were] incurred due to execution of that policy." Alkire v. Irving , 330 F.3d 802, 815 (6th Cir. 2003) (citing Garner , 8 F.3d at 364 ).
Morgan and Graf have made that showing. It is uncontested that the county's policy required officers to enter "onto the back" of any property during every 'knock and talk.' And as acknowledged by the sheriff and members of the SCRAP unit, that policy did not give any leeway for the officers to consider the constitutional limits that they might face. The SCRAP unit did not weigh the characteristics of properties to determine what parts of the properties were curtilage (and thus off limits). The policy gave no weight to the core value of the Fourth Amendment-one's right to retreat into his or her home "and there be free from unreasonable government intrusion." Collins , 138 S.Ct. at 1670 (quoting Jardines , 569 U.S. at 6, 133 S.Ct. 1409 ). Quite the opposite: the policy commanded that the SCRAP unit ignore those limits. It was not one employee's interpretation of a policy that caused Morgan's and Graf's injuries-the policy was carried out precisely as it was articulated. And so, because the county's policy itself was the cause of Morgan's and Graf's injury, the county should be held liable under Monell .
CONCLUSION
It is well-established that a warrantless entry of the home or the area immediately surrounding the home is presumed unreasonable unless it meets one of a few narrow exceptions. The SCRAP unit, following official policy, entered the constitutionally protected area around Morgan's and Graf's home without a warrant and without satisfying any of the narrow exceptions to the warrant requirement. In doing so, they violated the Fourth Amendment. But because of the state of this circuit's Fourth Amendment law at the time of the search, it was not clearly established that members of the SCRAP unit could not do what they did. For that reason, we AFFIRM the district court's decision granting summary judgment to the individual officers based on qualified immunity. On the other hand, because the county's policy itself required officers to ignore the Constitution's rules protecting the curtilage and the home, we REVERSE the decision of the district court granting summary judgment to the county *567 and the county officials in their official capacities. We REMAND the case for further proceedings consistent with this opinion.
CONCURRENCE
JANE B. STRANCH, Circuit Judge, concurring.
I join the majority opinion in full. I write separately only to emphasize the unique circumstances that merit applying qualified immunity in this case. As the Supreme Court recently reaffirmed, it "has long been clear that curtilage is afforded constitutional protection," and "officers regularly assess whether an area is curtilage before executing a search." Collins v. Virginia , --- U.S. ----, 138 S.Ct. 1663, 1674-75, 201 L.Ed.2d 9 (2018) (citing Oliver , 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) ). Despite this fundamental principle, our jurisprudence has evidenced some confusion related to the police action that we refer to as " 'knock and talk' investigations." See United States v. Darden , 508 F. App'x 387, 388 (6th Cir. 2012) ; Hardesty v. Hamburg Township , 461 F.3d 646, 654 (6th Cir. 2006) (referencing the "knock and talk investigative technique already recognized in this circuit"). A materially indistinguishable case, Turk v. Comerford , 488 F. App'x 933 (6th Cir. 2012), demonstrates that, at the time of the search at issue, even federal appellate judges were struggling with assessments of curtilage in the limited context of knock-and-talk investigations. It is rare to have a contemporaneous circuit case revealing judicial confusion on the precise question confronted by police officers. The existence of one here supports finding the law sufficiently unsettled that the officers should receive qualified immunity.
This case, moreover, presents different circumstances from even Wilson v. Layne , 526 U.S. 603, 618, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), referenced by the majority. There, the Supreme Court acknowledged that the "state of the law" at the time of the constitutional violation was "undeveloped" and that a circuit split had arisen between the alleged violation and that Court's ultimate decision. Id. The Supreme Court therefore declined to punish the officers' lack of prescience. Id. But the case before us is quite unlike the open question in Wilson , which had percolated up through the circuits on its way to final resolution by the Supreme Court. As explained in the majority opinion, Turk and Hardesty instead stand alone on a doctrinal spur. For purposes of this case, however, Turk is sufficient to show that the law surrounding knock and talk investigations was muddy at the relevant time. Though this is the unusual case in which an outlier may insulate officers from liability, today's decision forecloses that possibility for future cases.
CONCURRING IN PART AND DISSENTING IN PART

A 'knock and talk' is an investigative technique in which police, without a warrant, knock on a suspect's door and ask to speak with the suspect or for consent to search. See United States v. Thomas , 430 F.3d 274, 277 (6th Cir. 2005).

Although the parties dispute why Graf closed the door, no one disputes that she did. Graf insists that Campbell put his foot across the threshold and she told him that if he did not have a warrant he would have to leave. Campbell, on the other hand, stated that Graf closed the door so that she could lock up her dog. The factual discrepancies are immaterial-the case is about the officers around the perimeter, not the officer at the front door.

The county asserts facts in its brief that are not discussed in this opinion because they are immaterial or unsupported in the record. For example, the county outlines overall amounts of various drugs that the SCRAP unit confiscated in 2012; explains how the unit prepared for knock and talks; and even asserts that if the knock-and-talk policy is unconstitutional, the SCRAP unit will have to disband entirely.