# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-3097

_____

United States of America

*Plaintiff - Appellee*

v.

Charles F. White

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: November 15, 2018
Filed: June 28, 2019

_____

Before GRUENDER, KELLY, and GRASZ, Circuit Judges.

_____

KELLY, Circuit Judge.

In May 2012, Charles F. White and his co-defendant Anthony L. Bearden were charged with one count of manufacturing marijuana in violation of federal law. A superseding indictment charged additional counts in 2013, and pursuant to a conditional plea agreement, White pleaded guilty in 2017 to one count of conspiracy to manufacture 1,000 or more marijuana plants, in violation of 21 U.S.C. §§ 846,

841(a)(1), and 841(b)(1)(A). The district court[1] sentenced White to the statutory minimum of 10 years' imprisonment. He now appeals the district court's[2] denial of his motion to suppress and its[3] denial of his motion to dismiss the indictment on equal protection grounds.

I

A

Our decision in Bearden's appeal, United States v. Bearden, 780 F.3d 887 (8th Cir. 2015), provides the necessary background for this case, which we recite in abridged form here. Officer Billy Simpson and Detective Ken Minica of the Polk County Sheriff's Department first encountered White's property in rural Missouri when they were attempting to locate an address for an unrelated criminal investigation. Unable to do so, the officers sought to contact local residents for assistance and came upon White's property. The officers drove down its long driveway, which is lined with dense woods and loops around a house, and continued to the south side of the house until they reached what they believed was the front. They exited their

---

[1]The Honorable M. Douglas Harpool, United States District Judge for the Western District of Missouri.

[2]The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri, now deceased, adopting the report and recommendations of the Honorable James C. England, United States Magistrate Judge for the Western District of Missouri.

[3]The Honorable Brian C. Wimes, United States District Judge for the Western District of Missouri, adopting the report and recommendations of the Honorable Matt J. Whitworth, then United States Magistrate Judge for the Western District of Missouri, now Chief Magistrate Judge for the Western District of Missouri.

vehicle and immediately smelled a strong odor of green marijuana. After briefly speaking with White about the unrelated criminal investigation, the officers left.

Later in the day and accompanied by COMET[4] Drug Task Officers, Detective Simpson and Officer Minica returned to White's property. Two officers drove through White's driveway until they reached what they believed was the front door. The officers knocked on the door in an attempt to contact White, but no one answered. During this second visit, the odor of marijuana was even stronger than it had been earlier in the day. After no one answered the door, the officers decided to apply for a warrant to search White's property, and three officers remained there to secure the area while awaiting the warrant. The officers did not search anything while they waited.

The officers who stayed behind then encountered Bearden, who told them that he rented the adjoining property from White. When questioned, Bearden stated that he had "personal use marijuana" in his residence and allowed the officers to enter his property. There, the officers again smelled a strong odor of green marijuana. Based on these observations and interactions with Bearden, officers sought a warrant to search Bearden's property as well. Both warrants were issued, and officers found hundreds of marijuana plants growing inside the shop building on White's property and inside the shed on Bearden's property.

B

White and Bearden were indicted. They each filed motions to suppress, alleging violations of the Fourth Amendment. After the magistrate judge held a joint

---

[4]COMET refers to the Combined Ozarks Multijurisdictional Enforcement Team.

evidentiary hearing, both motions were denied in a single order. Shortly thereafter, in October 2013, Bearden conditionally pleaded guilty to one count of conspiracy to manufacture 1,000 or more marijuana plants and to one count of possession of a firearm in furtherance of a drug-trafficking offense. White continued to litigate several motions before the district court, including the motion to dismiss the indictment that he challenges in this appeal.

While White's case continued its way through the district court, Bearden appealed. Among other things, he challenged the denial of his motion to suppress evidence seized from White's property. We affirmed, rejecting Bearden's contention that the officers violated his Fourth Amendment rights both times they "drove up White's driveway and entered his curtilage without a warrant or a showing of exigent circumstances." Bearden, 780 F.3d at 893. We accepted the government's concession that the officers entered White's curtilage and reached several conclusions relevant to the instant appeal.

First, we held that the officers' initial visit to White's property was constitutionally permissible because "no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways." Id. at 894 (quoting United States v. Wells, 648 F.3d 671, 679 (8th Cir. 2011)). The Fourth Amendment did not prohibit the officers from entering White's curtilage to "obtain assistance in locating an address" while "investigating criminal activity wholly unrelated to White or Bearden." Id. Second, we rejected Bearden's contention that the officers' return visit was constitutionally infirm. We held that the officers' second entry into the curtilage did not constitute a search, but was rather a

"knock-and-talk" permitted by the Fourth Amendment.[5] We explained that "[o]nce Officer Simpson and Detective Minica discovered evidence of criminal activity, based on the strong odor of marijuana, they were permitted to return to the property for a 'legitimate law enforcement objective.'" Bearden, 780 F.3d at 894 (quoting United States v. Robbins, 682 F.3d 1111, 1115 (8th Cir. 2012)).

Against this backdrop, White now appeals.

II

White first challenges the district court's denial of his motion to suppress. He does not challenge the officers' first entry onto his property, but, relying on Florida v. Jardines, 569 U.S. 1 (2013), he asserts that their second entry violated his Fourth Amendment rights. According to White, the second entry "went beyond" a "knock-and-talk" because, he claims, the officers wanted to follow up on the odor of green marijuana they had smelled earlier in the day. In Bearden, we unequivocally held that the officers' second entry onto White's curtilage constituted a permissible knock-and-talk, but the defendant there did not raise a Jardines-based challenge. But even after further consideration of the motion to suppress in light of Jardines, we again conclude that the result is the same.

"On appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error and its conclusions of law de novo." Bearden, 780 F.3d at 892. "We affirm unless the denial of the motion is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the

---

[5]"A 'knock and talk' is an investigatory technique in which law enforcement officers approach the door of a dwelling seeking voluntary conversation and consent to search." United States v. Crisolis-Gonzalez, 742 F.3d 830, 833 n.2 (8th Cir. 2014).

entire record, it is clear that a mistake was made." Id. (quoting United States v. Douglas, 744 F.3d 1065, 1068 (8th Cir. 2014)).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. This guarantee extends not only to a residence, but also to the residence's curtilage. Bearden, 780 F.3d at 893. Under the property-based approach to the Fourth Amendment that the Supreme Court utilized in Jardines, "[w]hen the Government obtains information by physically intruding on persons, houses, papers, or effects, a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred." 569 U.S. at 5 (cleaned up). "Such conduct thus is presumptively unreasonable absent a warrant." Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018).

But consistent with the Fourth Amendment, the knock-and-talk exception to the warrant requirement permits "a police officer not armed with a warrant [to] approach a home and knock." Jardines, 569 U.S. at 8. This so-called knock-and-talk exception to the warrant requirement is founded on the "implicit license" all of us, including law enforcement officers, enjoy to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id. When officers objectively exceed the scope of this license, the knock-and-talk exception cannot justify their warrantless intrusion of the curtilage. That is why the officers in Jardines could not rely on the knock-and-talk exception: they did not approach the home to knock and speak with its occupants, and "they had no invitation to 'introduc[e] a trained police dog to explore the area around the home in hopes of discovering incriminating evidence.'" United States v. Hopkins, 824 F.3d 726, 731 (8th Cir. 2016) (alteration in original) (quoting Jardines, 569 U.S. at 9). "[T]heir behavior objectively reveal[ed] a purpose to conduct a search, which is not what anyone would think he had license to do." Jardines, 569 U.S. at 10.

This case is different. The officers' conduct does not "objectively reveal[] a purpose to conduct a search." Id. As White concedes, and as the district court found, the officers entered his curtilage and knocked on his door. In fact, White cites testimony from each of the officers that they returned to his property to "establish contact with [him] again" and to "attempt to make contact with the property owner." As we explained in Bearden, and as Jardines reaffirms, this conduct falls squarely within the scope of the knock-and-talk exception to the warrant requirement.

Nevertheless, White asserts that the officers' motivation for engaging in the knock-and-talk, that is, following up on the odor of green marijuana detected on the first entry, renders the second entry impermissible under Jardines. As an initial matter, we note that the subjective intent of an officer cannot vitiate otherwise objectively reasonable conduct. See Jardines, 569 U.S. at 10 ("[A] stop or search *that is objectively reasonable* is not vitiated by the fact that the officer's real reason for making the stop or search has nothing to do with the validating reason."). Even after Jardines, the relevant inquiry is whether the officers' conduct on the second entry is objectively reasonable. See id. ("Here, however, the question before the court is precisely *whether* the officer's conduct was an objectively reasonable search."). And Jardines also explained that the mere purpose of discovering information does not, standing alone, render conduct unreasonable under the Fourth Amendment. "[I]t is not a Fourth Amendment search to approach the home in order to speak with the occupant, *because all are invited to do that*. The mere 'purpose of discovering information' in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment." Id. at 9 n.4 (citation omitted). So to the extent that White argues that the officers' "purpose of discovering information" about possible illegal activity renders the second entry impermissible, that purpose, without more, cannot be enough to support his conclusion.

So the question then falls back to whether the officers' conduct in this case was "permitted conduct," that is, whether the officers had an implicit license to do what they did: approach White's door and knock. That is so because so long as that conduct falls in the category of "permitted," the officers' gathering of information "in the course of engaging in" that conduct is also permissible. Id. More specifically, in this case, if the officers were lawfully on the curtilage by virtue of the knock-and-talk license, their plain smell of marijuana cannot constitute a search. 1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.2(a) (5th ed. 2012) ("Just as what an officer sees where he is lawfully present is a nonsearch plain view, what he learns by reliance upon his other senses while so located is likewise no search and thus per se lawful."); see also Jardines, 569 U.S. at 15 n.2 (Kagan, J., concurring) ("[A] human sniff is not a search, we can all agree.").

Jardines explains that whether the officers had an implicit license to enter a constitutionally-protected area in turn depends upon the purpose for which they entered. 569 U.S. at 10. But in Jardines, the objective behavior of the officers—not their subjective intent—showed that their purpose was to conduct a search. Id. Walking up to the front porch to conduct a search (with a drug-sniffing dog) was clearly outside the implicit knock-and-talk license. Here, by contrast, the officers approached the home, knocked promptly, and waited to be received. See id. at 8. These facts are not in dispute. Accordingly, the officers' second entry was a permissible knock-and-talk.[6]

---

[6]Contrary to the concurrence's suggestion, we do not use the plain smell doctrine to "validate" the officers' second visit. We validate the second visit by evaluating the officers' objective conduct, which, as explained, comports with the knock-and-talk exception to the warrant requirement. And once lawfully on the curtilage by virtue of the knock-and-talk license, under the plain smell doctrine, the officers' subsequent detection of marijuana does not constitute a search.

The concurrence would hold that, under Jardines, the second entry violated White's Fourth Amendment rights because additional officers drove to his home and they all had the subjective intent of gathering information in the course of conducting a knock-and-talk. As an initial matter, we fail to see why the number or type of officers in this case would render the second entry impermissible. But more significantly, Jardines did not hold that the scope of a license is dependent on the officers' subjective intent. To the contrary, it reiterated long-standing precedent holding that conduct "that is objectively reasonable" will not be deemed unlawful simply because it may have, subjectively, been motivated by impermissible or pretextual reasons, such as racial harassment. 569 U.S. at 10; Morgan v. Fairfield Cty., 903 F.3d 553, 563 (6th Cir. 2018) ("[Under Jardines, t]he subjective intent of officers is irrelevant if a search is otherwise objectively reasonable, but subjective intent cannot make reasonable an otherwise unreasonable intrusion onto a constitutionally protected area."), cert. denied, 139 S. Ct. 1377 (2019). Under Jardines, the standard remains an objective one. White points to nothing in the record that reveals that the officers engaged in objectively unreasonable conduct in approaching his door to knock the second time. Cf. Morgan, 903 F.3d at 563 (rejecting officers' contention that their conduct fell within knock-and-talk exception where they surrounded a house and positioned themselves in the backyard); United States v. Maxi, 886 F.3d 1318, 1326–27 (11th Cir.) (holding that officers exceeded scope of knock-and-talk license where "ten officers surrounded the building at night, one with his gun drawn"), cert. denied, 139 S. Ct. 351 (2018). As we held in Bearden, the district court properly denied White's motion to suppress.[7]

---

[7]The concurrence also suggests that our holding "seem[s] to legitimize roving government search patrols approaching peoples' homes or entering their curtilages under the guise of 'knock and talk.'" It does no such thing. Our holding is limited to the facts of this case. As explained, the undisputed evidence shows that on the second entry, the officers *in fact* conducted a knock-and-talk: they approached White's door, knocked, and waited to be received.

# III

The second issue that White challenges on appeal is the district court's denial of his motion to dismiss the indictment. Before the district court, White argued that the policy statements that then-Deputy Attorney General James Cole issued to U.S. Attorneys in August 2013 and February 2014 (collectively, the Cole Memos) about the federal enforcement priorities for marijuana-related conduct resulted in discriminatory application of federal law. Specifically, he argued that pursuant to the Cole Memos, the federal government prosecuted him while granting impunity to those engaged in similar conduct in areas where marijuana is legal under state law, violating his rights under the Equal Protection Clause.[8] The district court rejected this argument, finding that White had failed to show the necessary elements of a selective prosecution claim. On a selective prosecution claim like the one White raises here, "we review the district court's legal conclusions de novo and its factual findings for clear error." United States v. Chappell, 779 F.3d 872, 879 (8th Cir. 2015) (explaining the proper standard of appellate review on vindictive prosecution claims); see also United States v. Peterson, 652 F.3d 979, 980–81 (8th Cir. 2011) (per curiam).

We conclude that the district court properly denied White's motion. Subject to constitutional constraints, "[i]n our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute." Wayte v. United States, 470 U.S. 598, 607 (1985) (quoting United States v. Goodwin, 457 U.S. 368, 380 n.11 (1982)). "One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, is that the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classifica-

---

[8]We note that the Cole Memos have since been rescinded and also that the first of the Cole Memos was issued after White's first indictment. Neither party briefed the effect of the date of issuance on this appeal, so we do not discuss the issue here.

tion.'"[9] <u>United States v. Armstrong</u>, 517 U.S. 456, 464 (1996) (citation omitted) (quoting <u>Oyler v. Boles</u>, 368 U.S. 448, 456 (1962)). The Supreme Court has analyzed selective prosecution claims by "draw[ing] on 'ordinary equal protection standards,'" requiring a claimant to "demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" <u>Id.</u> at 465 (quoting <u>Wayte</u>, 470 U.S. at 608)).

We have interpreted this standard as requiring a selective prosecution claimant to show "1) that he has been singled out for prosecution while others similarly situated have not been prosecuted for similar conduct and 2) that the government's action in thus singling him out was based on an impermissible motive such as race, religion, or the exercise of constitutional rights." <u>United States v. Parham</u>, 16 F.3d 844, 846 (8th Cir. 1994). This "standard is a demanding one," <u>Armstrong</u>, 517 U.S. at 463, and one that White has failed to meet.

We agree with the district court that White has not satisfied the first prong. White relies solely on the Cole Memos to show that he has been singled out for prosecution, but the Cole Memos do not "single out" anyone. The Cole Memos do not "affirmatively . . . allow marijuana-growing operations in certain states," as White suggests. Rather, they merely set forth eight priorities to guide federal prosecutorial discretion based on the "expectation that states and local governments that have

---

[9]White styles his claim as one under the Fourteenth Amendment, but we note that it is properly brought under the Fifth Amendment because it implicates the federal government. <u>See</u> <u>Cruz v. Hauck</u>, 404 U.S. 59, 62 n.10 (1971) (Douglas, J., concurring) ("Although no explicit equal protection clause is directed by the Constitution against the Federal Government the concept of equal protection of the laws is incorporated into the Due Process Clause of the Fifth Amendment."). In any event, "[the] approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." <u>Weinberger v. Wiesenfeld</u>, 420 U.S. 636, 638 n.2 (1975).

enacted laws authorizing marijuana-related conduct will implement strong and effective regulatory and enforcement systems that will address the threat those state laws could pose to public safety, public health, and other law enforcement interests." Memorandum from James M. Cole, Deputy Att'y Gen., U.S. Dep't of Justice, to All U.S. Att'ys, at 2 (Aug. 29, 2013), https://www.justice.gov/iso/opa/resources/3052013829132756857467.pdf. These enforcement priorities include "[p]reventing the distribution of marijuana to minors," "[p]reventing revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels," and "[p]reventing violence and the use of firearms in the cultivation and distribution of marijuana." Id. at 1–2. The Cole Memos are "intended solely as a guide to the exercise of investigative and prosecutorial discretion," and "do[] not alter in any way the [Department of Justice]'s authority to enforce . . . federal laws relating to marijuana, *regardless of state law*." Id. at 4 (emphasis added). Indeed, the Cole Memos stress that "[e]ven in jurisdictions with strong and effective regulatory systems," individuals who threaten federal priorities will still be subject to federal prosecution. Id. By their terms, then, the Cole Memos do not create a policy by which residents of states where marijuana has been legalized are affirmatively treated differently from those of states where it has not.

White also fails to meet the first prong because he has not shown that he engaged in "similar conduct" as individuals that he alleges have not been prosecuted. See United States v. Smith, 231 F.3d 800, 810 (11th Cir. 2000) (defining "a 'similarly situated' person for selective prosecution purposes as one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan"). White argues that the Cole Memos "allow[] other residents of the United States to engage in the same or similar conduct"—presumably large-scale marijuana cultiva-

tion—without facing federal prosecution. But White misses the point. He is not engaging in the same or similar conduct as residents of states that have legalized marijuana because residents of those states are subject to strict regulatory and enforcement systems to which White simply is not subject.[10] Because White is not complying with the regulations that legal cultivators in other states comply with, he is not engaging in the same or similar conduct. And White has not shown, or even alleged, that a resident of a state that has legalized marijuana would not be prosecuted for cultivating it in the same manner that White cultivated it, that is, without compliance with the state regulatory system. Accordingly, we conclude that the district court did not clearly err in finding that White had failed to meet the first prong of a selective prosecution claim.

Similarly, the district court did not clearly err in finding that White failed to show that a constitutionally impermissible motive such "racial or religious bias or the . . . exercise of a constitutional right" played a role in his prosecution. United States v. Leathers, 354 F.3d 955, 963 (8th Cir. 2004); see also Peterson, 652 F.3d at 981 (selective prosecution claim failed where defendant did not show that race or gender played a role in the government's charging decisions). The Cole Memos explain that in considering federal prosecutions under the Controlled Substances Act, the "primary question" should be "whether marijuana-related conduct implicates one or more of [the eight] enforcement priorities" specified in the memorandums. Memorandum from James M. Cole, Deputy Att'y Gen., U.S. Dep't of Justice, to All U.S. Att'ys, at 1–2 (Feb. 14, 2014). We cannot find, and White does not point to, any impermissible motive in the enforcement priorities highlighted in the Cole Memos. See Wayte, 470 U.S. at 607 ("Such factors as . . . the Government's enforcement

---

[10]Before the district court, White argued that the so-called Right to Farm Amendment to the Missouri Constitution legalized cultivation of marijuana in Missouri. But the Missouri Supreme Court has since rejected that argument. See State v. Shanklin, 534 S.W.3d 240, 242–43 (Mo. banc 2017).

priorities[] and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.").

For all the aforementioned reasons, the judgment of the district court is affirmed.

GRASZ, Circuit Judge, concurring in part and concurring in the judgment.

I agree the district court properly denied White's motion to dismiss his indictment on equal protection grounds and I join Section III of the court's opinion. I write separately because I have serious doubts about whether the second warrantless entrance onto White's property by law enforcement officers complied with the Fourth Amendment under the standard the Supreme Court articulated in *Florida v. Jardines*, 569 U.S. 1 (2013).

In *Jardines*, the Court concluded there was no implied license for a law enforcement officer to "introduc[e] a trained police dog to explore the area around the home in hopes of discovering incriminating evidence . . . [because t]here is no customary invitation to do *that*." *Id.* at 9. The Court explained that "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. . . . Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.* Importantly, the Court rejected the argument that the purpose of an entrance into a home's curtilage cannot be considered due to the Court's precedents holding that "the subjective intent of the officer is irrelevant." *Id.* at 10. It is true that "a stop or search *that is objectively reasonable* is not vitiated by the fact that the officer's real reason for making the stop or search has nothing to do with the validating reason." *Id.* But in *Jardines*, whether the search was objectively reasonable "depend[ed] upon whether the officers had an

-14-

implied license to enter the porch, which in turn depend[ed] upon the purpose for which they entered." *Id.* The Court concluded the officers' "behavior objectively reveal[ed] a purpose to conduct a search, which is not what anyone would think he had license to do." *Id.*

My concern with the court's opinion is that while it acknowledges *Jardines*, its analysis fails, in my view, to apply *Jardines'* holding. Under *Jardines*, we must examine whether the officers acted within the scope of the implied license to enter White's curtilage, that is, whether they remained within the scope of what "any private citizen might do." *Id.* at 8 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). The scope of this implied license "is limited not only to a particular area but also to a specific purpose." *Id.* at 9.

The officers' admitted purpose, together with how this purpose was manifested in their objective behavior, is key to applying *Jardines*. Officer Simpson testified in the suppression hearing that after running into drug task force officers at another location, he "advised them of what we had smelled and what we had noticed while making contact with Charles White earlier that day. And upon that discussion with the task force officers, we decided [to] try to establish contact with Mr. White again . . . and *see if we could continue to smell what I had smelled earlier that day*." The officers' return to White's residence with the drug task force officers, together with Officer Simpson's candid statement about their purpose, objectively revealed that their purpose was not just to speak with White, but to confirm the smell of green marijuana on White's property. In *Jardines*, the Court held there was no implied license to go onto a front porch with a drug dog for the purpose of sniffing out evidence of drugs. I would conclude that neither was there an implied license for the officers to return to White's curtilage with a team of drug task force members for the purpose of sniffing out evidence of drugs. This second visit to confirm the smell of green marijuana lies in stark contrast to the first visit, which the record unequivocally

-15-

shows was done for the purpose of speaking with White in search of information about an unrelated investigation.

To be clear, while the subjective intent to search for evidence, standing alone, does not implicate *Jardines*, the officers' objective behavior does. The officers did not simply exercise the license the public had to approach White's home to "knock and talk." Rather, they returned to White's home a second time accompanied by COMET Drug Task Force officers who had agreed to travel to White's residence to help smell for marijuana. Surely, as in *Jardines*, there "is no customary invitation to do *that*." *Jardines*, 569 U.S. at 9. To conclude otherwise would seem to legitimize roving government search patrols approaching peoples' homes or entering their curtilages under the guise of "knock and talk." If the Constitutional right to be secure from unreasonable government searches of one's home is to be effectuated, surely such patrols cannot be rationalized as being licensed by the "habits of the country."

I find unconvincing the court's invocation of the plain smell doctrine to validate the second visit. Under the plain view doctrine, "[a]n officer does not violate the Fourth Amendment by viewing [or smelling] evidence from a position he lawfully occupies, remembering it, and using it later" to obtain a search warrant. *United States v. Morgan*, 842 F.3d 1070, 1075 (8th Cir. 2016). But before applying the plain view doctrine we must first answer the threshold question of whether the officers were lawfully present on White's curtilage. And answering that question requires looking at the purpose of the entrance. As discussed above, the record shows the objectively demonstrated purpose here was not simply to speak with White, but for the officers (joined now by drug task force members) to "see if [they] could continue to smell what [they] had smelled earlier that day." In short, the officers' behavior objectively manifested an intent to conduct a warrantless search of White's property rather than conduct a permissible "knock and talk."

While I respectfully disagree with the court's analysis, I do concur in its judgment affirming the district court's denial of White's suppression motion because the denial was likely proper under the independent source doctrine. The officers' statements in the search warrant affidavit regarding smelling green marijuana on their first visit to White's home — a visit that White rightly does not contend violated the Fourth Amendment — was sufficient to create probable cause to support the search warrant.[11]

———————————————

———————————————

[11]The record also supports the conclusion that the other requirement for the application of the independent source doctrine in this context is met: the officers would have sought the search warrant even if they had not gone onto White's property a second time. *See United States v. Swope*, 542 F.3d 609, 613–14 (8th Cir. 2008). However, if the court were to resolve this case under the independent source doctrine, it may be necessary to remand the case on a limited basis for the district court to make a factual finding to that effect in the first instance. *See United States v. Rodriguez*, 834 F.3d 937, 942–43 (8th Cir. 2016).