[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-13182

_____

D.C. Docket No. 1:14-cr-20104-RLR-5

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

WILLIS MAXI,
MARKENTZ BLANC,
a.k.a. Blind,
a.k.a. Burn,

Defendants - Appellants,

ESPERE DESMOND PIERRE,
a.k.a. Papa D,

Defendant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(April 5, 2018)

Before MARTIN, JORDAN, and WALKER,[*] Circuit Judges.

MARTIN, Circuit Judge:

Willis Maxi and Markentz Blanc appeal their convictions, after a jury trial, on charges relating to their participation in an extensive drug distribution network. Mr. Maxi challenges the admission of evidence he says was the product of an illegal search. Mr. Blanc challenges the admission of evidence from wiretaps as well as an instruction given to the jury about flight. After careful review, and with the benefit of oral argument, we affirm.

## I.  FACTUAL BACKGROUND

On July 9, 2012, the Miami-Dade Police Department received a tip from a confidential informant that a person known as "Papa D"[1] engaged in drug activity and kept firearms at one unit of a duplex located at 132 NE 64th Street in Miami. Detective Scott Ogden and another officer met with the informant and drove him to the duplex. The informant identified the back unit as the one where guns and drugs would be found.

Officers then began surveilling the property. One officer set up to watch the house and others were positioned nearby. "[M]aybe ten or [fifteen] minutes or less"

---

[*] Honorable John M. Walker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

[1] "Papa D" was later identified as Espere Pierre. Mr. Pierre was originally part of this appeal. Another panel of this Court granted Mr. Pierre's attorney's motion to withdraw pursuant to Anders v. California, 386 U.S. 738, 87 S. Ct. 1396 (1967), and affirmed Mr. Pierre's convictions and sentence in a separate order.

after setting up, officers saw two men leave the duplex and get into a truck. Officers stopped the truck about a quarter mile from the duplex and asked the men for identification. Mr. Blanc was the driver and Mr. Pierre was the passenger. After a search revealed no contraband, the officers let the men leave. The truck then turned immediately back toward the duplex.

When he was told the truck was returning to the duplex, Detective Ogden ordered all the officers in the area to go there as well. Detective Ogden testified: "We decided—or I decided that we should approach the residence with them there because I had a feeling that maybe they would alert the persons inside." At least five police cars, holding approximately ten police officers, pulled up to the duplex. Seeing the police approach, Mr. Blanc "took off running and was apprehended shortly after." Mr. Blanc and Mr. Pierre were both detained. They were eventually released again without being charged.

Four or five police officers ran to the door of the back unit while the remaining officers covered other strategic positions surrounding the duplex. The back unit's door was not visible from the street. To get to it, the officers passed through a gate in a chain-link fence that surrounded the yard. At least one officer who approached the door had his gun drawn and held in a "low, ready position." It was dark out.

The door itself had an exterior metal security gate, with a wooden interior

3

door behind it.  The metal security gate had bars that were five to six inches apart—wide enough that Detective Ogden reached through the bars and knocked on the wooden door.  Detective Ogden testified he was "pretty sure" no one announced "police" when he knocked.

Mr. Maxi opened the wooden interior door very soon after Detective Ogden knocked.  Detective Ogden testified that "[d]irectly behind Mr. Maxi, [he] could see a clear mixing bowl as well as a white plate, with the plate having naked crack rocks, and the clear mixing bowl having packaged crack cocaine and a razor blade on the plate and a scrap piece of paper."  Detective Ogden said these objects were approximately five to ten feet away from his position at the door.

When he saw the officers, Mr. Maxi "attempted to fade off" out of view, but Detective Ogden told him to stay where he was.  Upon questioning, Mr. Maxi said he didn't live at the duplex and didn't know who did.  Detective Ogden asked Mr. Maxi to step outside, but Mr. Maxi said he couldn't because the metal security gate was locked and he didn't have a key.[2]  Detective Ogden asked Mr. Maxi if he was burglarizing the residence, and Mr. Maxi responded, "oh, I will go for burglary."  At some point, Detective Ogden told Mr. Maxi he was under arrest.

The officers decided to force the security gate open.  Detective Ogden testified he was concerned that Mr. Maxi would destroy evidence.  Once the gate

---

[2] This was not true.  Mr. Maxi did have a key to the security gate.

was pried open, Detective Ogden pulled Mr. Maxi out of the building, and handcuffed him. Approximately five officers then conducted a protective sweep of the unit, which Detective Ogden said took about two minutes. Detective Ogden testified that during the sweep, he saw more packaged crack cocaine, a semiautomatic handgun, four rifles, and a stack of money. After the sweep, the officers left the unit and applied for a search warrant.

Before the warrant was issued but after the protective sweep, Lieutenant Luis Almaguer and another officer did a walk-through of the unit. Lieutenant Almaguer said he wanted to "verify[] what they are writing [in the search warrant application] is what they saw." He testified that the search warrant application did not rely on any of his observations from the walk-through. After the search warrant was issued, starting at around 2:00 AM, officers went back inside the unit and collected crack cocaine, guns, and Mr. Maxi's driver's license and other papers. The search concluded at 4:45 AM.

Once the search was over, Mr. Maxi was advised of his Miranda rights in the back of a police car. An officer also told Mr. Maxi the police had seen guns and drugs in the house. Several hours later, Mr. Maxi signed a formal waiver of his Miranda rights and was interviewed. He told police he worked as a "cut man" for "Papa D." He said he cut up and bagged crack cocaine, provided security, and resupplied other locations with crack cocaine.

The surveillance and search of the 64th Street property was only the beginning of the investigation into the drug organization in which Mr. Blanc, Mr. Pierre, and Mr. Maxi were involved. Law enforcement worked with confidential informants to make controlled purchases of crack cocaine from suspected members of the organization. The FBI then used a pen register and tap and trace device on Mr. Pierre's phone, and later received authorization to use a wiretap on Mr. Pierre's phone. The wiretap on Mr. Pierre's phone was in place for about a month during the summer of 2013.

On October 28, 2013, an FBI agent filed an application for a wiretap on Mr. Blanc's cell phone. The application described a wiretap as necessary to accomplish the goals of the investigation into the drug organization and listed a number of other investigative techniques that had been used or considered. The wiretap application was approved, and Mr. Blanc's phone was tapped from October 28 to November 26, 2013.

On November 21, 2013, more than a year after the search that led to Mr. Maxi's arrest, law enforcement executed a search warrant at 262 NW 52nd Street in Miami. A police officer saw Mr. Blanc outside the property and yelled, "Police, stop." Mr. Blanc turned and ran into the house, where he was detained. Drugs, guns, ammunition, and other evidence were also collected from this house.

6

## II. PROCEDURAL BACKGROUND

On February 20, 2014, Mr. Blanc and Mr. Maxi, along with six codefendants not part of this appeal, were indicted for crimes relating to a drug conspiracy. Both were charged with conspiracy to possess with intent to distribute a controlled substance; possession with intent to distribute a controlled substance; possession of a firearm in furtherance of a drug trafficking crime; and possession of a firearm by a convicted felon. Mr. Blanc was also charged with conspiracy to commit wire fraud, aggravated identity theft, and possession of unauthorized access devices with the intent to defraud.

Mr. Maxi and Mr. Blanc both filed motions to suppress evidence based on the government's alleged violations of law. Mr. Maxi filed a motion to suppress physical evidence and his statements related to the search at the 64th Street duplex. At the suppression hearing, Mr. Maxi's attorney argued that the police approach to the duplex exceeded the scope of a permissible "knock and talk." He said Mr. Maxi did not voluntarily open the duplex door, and that each of the police's actions that followed—breaking down the door, the protective sweep, the pre-warrant walk-through, the arrest—was illegal. He also argued that Mr. Maxi's statements should be suppressed as fruit of the poisonous tree. The government opposed, arguing that Mr. Maxi did not have standing to challenge the search; the police approach to the door was permissible; and Mr. Maxi's opening of the door was voluntary. Also, the

government argued that even if the officers' actions after approaching the door were impermissible, there was still sufficient information to support the search warrant because they could see crack cocaine in plain view from the door.

A Magistrate Judge issued a Report and Recommendation ("R&R") recommending that Mr. Maxi's motion be denied. The Magistrate Judge found that Mr. Maxi opened the door voluntarily and that the officers' protective sweep of the duplex was justified. The Magistrate Judge found that the pre-warrant walk-through violated the Fourth Amendment, but the crack cocaine observed by the officers in plain view once the door opened provided an independent source of probable cause to support the search warrant. The District Court adopted the R&R and denied Mr. Maxi's motion to suppress.

Mr. Blanc filed a motion to suppress the intercepted wire communications. He argued that the government had not shown "necessity to obtain or apply for interceptions in this case, and omitted material information from the Affidavit." In particular, he argued that the government's investigation had already been "exceedingly successful" before they applied for the wiretap and that the wiretap affidavit downplayed the role of the government's confidential informant.

A Magistrate Judge recommended that Mr. Blanc's motion be denied. The Magistrate Judge agreed with the statements in the affidavit that further physical surveillance, tracking devices, and use of confidential sources would not have

satisfied the goals of the investigation.  The Magistrate Judge also found that the "affiants did not intentionally or recklessly make material false statements or omit material facts in demonstrating the necessity of the wiretaps."  The District Court adopted the R&R and denied Mr. Blanc's motion to suppress.

In preparation for trial, the government requested a jury instruction about flight be given for Mr. Blanc.  Mr. Blanc objected.  The District Court overruled the objection and gave the following jury instruction:

> The flight of Defendant Blanc is a circumstance which may be taken into consideration with all other facts and circumstances of the evidence.  If you find from the evidence beyond any reasonable doubt that Defendant Blanc fled, and that his flight was for the purpose of avoiding arrest for a charge herein, you may take this fact into consideration in determining his guilt or innocence.

On April 21, 2015, a jury found Mr. Maxi guilty of all counts and Mr. Blanc guilty of all counts but one.  Mr. Maxi was sentenced to 312-months imprisonment, and Mr. Blanc to 300-months imprisonment, both below-guideline sentences.  This appeal followed.

### III.  MR. MAXI'S CLAIMS

When reviewing the District Court's denial of a motion to suppress evidence, we review findings of fact for clear error and application of law to facts de novo.  United States v. Jackson, 120 F.3d 1226, 1228 (11th Cir. 1997) (per curiam).  "[W]e construe all facts in favor of the prevailing party."  United States v. Robinson, 62 F.3d 1325, 1328 (11th Cir. 1995).

9

A. STANDING

We first consider whether Mr. Maxi has standing to challenge the search of the 64th Street property.  The District Court found "in an abundance of caution" that Mr. Maxi had standing.  The court relied on Mr. Maxi's testimony that "he had a legitimate presence in the facility, i.e., he has the permission of the person who leases it to be there."  On appeal, the government argues Mr. Maxi does not have standing to challenge the search since he was only at the duplex to package cocaine.  Alternatively, the government argues Mr. Maxi abandoned any privacy interest he may have had in the duplex when he told the officers he didn't live there.

In order to have standing to seek suppression of evidence, a defendant must establish both a subjective expectation of privacy in the place searched as well as the objective reasonableness of that expectation.  Robinson, 62 F.3d at 1328.  Mere presence where the search occurred is not enough to confer standing.  Rakas v. Illinois, 439 U.S. 128, 143, 99 S. Ct. 421, 430 (1978).  An overnight guest has a reasonable expectation of privacy in a residence sufficient to establish standing.  Minnesota v. Olson, 495 U.S. 91, 98–100, 110 S. Ct. 1684, 1689–90 (1990).  But a guest present only for a brief commercial transaction does not.  See Minnesota v. Carter, 525 U.S. 83, 90–91, 119 S. Ct. 469, 473–74 (1998).

Mr. Maxi gave somewhat contradictory information about his relationship to the duplex.  When he first opened the door, he told police he didn't live there,

10

didn't know who did, and didn't have a key.  At the suppression hearing, he testified that he had been living at the duplex for three to six months.  But he also said "I really live at my father's house," and that he wasn't at the duplex every day but "just to pay the bills only."  Mr. Maxi said he kept his clothes at his father's house and only his "food stamp card, Social Security and Western Union papers" at the duplex.  On cross examination, he clarified that he had lived at both the duplex and at his father's house, but that he'd been kicked out of his father's house.  Mr. Maxi testified that he paid half the rent to the duplex and had a key.

We conclude that Mr. Maxi has standing to challenge the search.  While this Court has recognized that a party can disclaim his privacy interest, such a disclaimer is only one factor that we weigh in our consideration of whether Mr. Maxi had a reasonable expectation of privacy in the duplex.  See United States v. Sweeting, 933 F.2d 962, 964 (11th Cir. 1991).  This record demonstrates that Mr. Maxi paid rent, had a key, and had been living at the duplex intermittently for three to six months.  He also kept important papers there.  While most of his personal effects were at his father's house, he also testified that he'd been kicked out of his father's house, leaving the duplex as his only place to stay.  Mr. Maxi was more than just an overnight guest—he was effectively a subtenant.  The fact that he also performed commercial activities at the duplex does not vitiate his expectations of privacy as a subtenant.  On these facts, Mr. Maxi had reasonable expectations of

privacy in the duplex. We therefore affirm the District Court's finding that Mr. Maxi had standing to challenge the search. We now consider each police action in turn.

## B. ENTRY ONTO THE CURTILAGE

Mr. Maxi first argues that the police illegally entered the curtilage of the duplex when ten officers surrounded the building at night, one with his gun drawn. The government responds that the entry was permissible because the officers were conducting a "knock and talk."

The Fourth Amendment guarantees "the right of a man to retreat into his own home and there be free from unreasonable government intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S. Ct. 679, 683 (1961). "A home's curtilage, the private property immediately adjacent to a home, is entitled to the same protection against unreasonable search and seizure as the home itself." United States v. Noriega, 676 F.3d 1252, 1262 (11th Cir. 2012) (quotation omitted and alterations adopted). Because the curtilage is a constitutionally protected space, the police must have an express or implied license to be there without a warrant. See Florida v. Jardines, 569 U.S. 1, 7–8, 133 S. Ct. 1409, 1415–16 (2013).

The "knock and talk" rule provides that police have an owner's implied permission to "approach a home and knock, precisely because that is no more than

12

any private citizen might do." Id. at 8, 133 S. Ct. at 1416 (quotation omitted). This license, "implied from the habits of the country . . . . typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id., 133 S. Ct. at 1415 (quotation omitted).

Also, "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose." Id. at 9, 133 S. Ct. at 1416. In Jardines, the Supreme Court concluded that police had exceeded the scope of a homeowner's customary invitation to the public when they came onto the curtilage with a drug-sniffing dog with the intent to "engage in canine forensic investigation." Id. As the Court noted, "[t]here is no customary invitation to do that." Id.

The reasoning in Jardines is not limited to the specific facts of bringing a drug-sniffing dog up to the front porch. It extends to any police intrusion onto curtilage that exceeds the customary license extended to all, whether measured by officers' actions or their intent. See id. 9–10 & n.3, 133 S. Ct. at 1416 & n.3. It wasn't just that the officer walked a dog up to the front door, it was that he did so with the intent to gather evidence. "[T]he background social norms that invite a visitor to the front door do not invite him there to conduct a search." Id. at 9, 133 S. Ct. at 1416. It is with equal force that the principles of Jardines do not invite an

13

armed battalion into the yard to launch a raid. Such a sight "would inspire most of us to—well, call the police." Id.

No doubt, the officers here breached the curtilage of the duplex. There were approximately ten officers who ran to the duplex, many going through a gate in the fence, with four or five approaching the door and the rest taking up tactical positions around the exterior. Mr. Maxi did not give the officers an express license to come into his yard. And while the officers had a license "implied from the habits of the country," id. at 8, 133 S. Ct. at 1415 (quotation omitted), to approach the front door and knock, they did much more than that. First, their physical intrusion was not "geographically limited to the front door or a 'minor departure' from it." United States v. Walker, 799 F.3d 1361, 1363 (11th Cir. 2015) (per curiam) (quoting United States v. Taylor, 458 F.3d 1201, 1204–05 (11th Cir. 2006)). Officers testified they took up tactical positions not just at the front door but around the perimeter of the duplex. Second, the officers' intent in approaching the duplex wasn't that of an ordinary citizen. Detective Ogden testified: "We decided—or I decided that we should approach the residence with them there because I had a feeling that maybe they would alert the persons inside." From the record before us, we do not doubt that the officers intended to secure the duplex and detain anyone they found inside, which is, of course, exactly what they did. That this encounter was not intended to be a casual, informational interview is also

supported by the fact that at least one officer had his gun drawn and in a "low, ready position."  As in Jardines, there is no customary invitation to do that.  See Jardines, 569 U.S. at 9, 133 S. Ct. at 1416.

Because their actions did not qualify as a "knock and talk," the officers here did not have a license to enter the curtilage of the duplex.  However, that is not the end of our inquiry.  "The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct."  Illinois v. Gates, 462 U.S. 213, 223, 103 S. Ct. 2317, 2324 (1983).  In Hudson v. Michigan, 547 U.S. 586, 126 S. Ct. 2159 (2006), the Supreme Court held that exclusion of evidence was not required when police officers committed a Fourth Amendment violation by failing to "knock and announce" when executing a search warrant.  Id. at 594, 126 S. Ct. at 2165.  In that case, the Court noted that the constitutional violation was in the manner of entry, not in the entry itself.  Id. at 588, 126 S. Ct. at 2162.  The officers had a valid warrant but conceded they had not waited an appropriate amount of time after knocking before entering to conduct a search.  Id.  And the "illegal manner of entry was not a but-for cause of obtaining the evidence.  Whether that preliminary misstep had occurred or not, the police would have executed the warrant they had

15

obtained," and they would have discovered the inculpatory evidence inside. Id. at 592, 126 S. Ct. at 2164.

Here, the constitutional violations of the officers did not result in the production of evidence. As in Hudson, the violation was the manner in which the officers approached the house, not that they approached at all. If Detective Ogden had walked up the path to the door alone, knocked, and waited briefly to be received, he would have conducted a proper "knock and talk." See Jardines, 569 U.S. at 8, 133 S. Ct. at 1415. There is no evidence to suggest that anything would have turned out differently if he had done so—Mr. Maxi opened the door almost immediately after Detective Ogden knocked and seemed entirely unaware of the scene developing outside. This is not to say, however, that "knock and talk" violations will never result in exclusion. For example, if Mr. Maxi opened the door because he saw a phalanx of officers descending on his location; if he did so as a result of a show of authority by the officers outside; or if he otherwise changed his behavior in response to a demand made by the officers, we would have a different case. Jardines makes clear that if officers had found evidence in the yard or peered through windows as they took up positions around the house, that evidence would be subject to exclusion. See id. at 9, 133 S. Ct. at 1416. But those are not our facts. Because the constitutional violations here did not produce the

16

contested evidence, we conclude that exclusion is not the appropriate remedy.  See

Hudson, 547 U.S. at 592, 126 S. Ct. at 2164.

C.  OPENING THE DOOR

Next, Mr. Maxi argues that he did not open the door voluntarily.  He says

"[g]iven the number of police officers on the property, the unlawful seizure and

detention of two individuals while on the property, and where at least one of the

officers approached the front door with his weapon drawn, a reasonable person

would believe that they had no other option but to open the door."  The

government responds that all evidence suggests Mr. Maxi didn't know the police

were at the door and that his opening of the door was consensual.

When a person opens their door "in response to a show of official authority,"

that act cannot be seen as consensual.  See United States v. Tovar-Rico, 61 F.3d

1529, 1536 (11th Cir. 1995) (quotation omitted).  We review the voluntariness of

consent "in light of the totality of the circumstances."  United States v. Tobin, 923

F.2d 1506, 1512 (11th Cir. 1991) (en banc).  Our circuit has a number of cases in

which "police have used their position to demand entry," and we concluded that

the consent to enter was not voluntary.  Id.

For this case, the Magistrate Judge found (and the District Court adopted the

finding) that Mr. Maxi did not open the door in response to a show of authority.

Detective Ogden testified that his recollection was that no one yelled "police," and

17

after he knocked once, Mr. Maxi quickly opened the door.  Evidence was also presented that the windows were covered so Mr. Maxi could not have seen the police outside.  Mr. Maxi's surprise at seeing police and his immediate attempt to move out of view also support a finding that he did not expect the police to be at the door.  Viewing the totality of the circumstances, the District Court did not err in finding that Mr. Maxi voluntarily opened the door.

D. THE ARREST

Mr. Maxi argues that the police committed another constitutional violation when they broke down the metal security gate and arrested him in his home without a warrant.  The government responds that the warrantless arrest was supported by probable cause that Mr. Maxi had committed a crime (packaged crack cocaine was visible from the front door) and by exigent circumstances based on officer safety and the risk that evidence would be destroyed.

"A finding of probable cause alone . . . does not justify a warrantless arrest at a suspect's home."  United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir. 1986).  To justify a warrantless arrest in a suspect's home, the government must show both probable cause and the presence of exigent circumstances.  Id. at 1514. "The exigent circumstances exception encompasses situations such as hot pursuit of a suspect, risk of removal or destruction of evidence, and danger to the arresting officers or the public."  Id. at 1515.

18

Mr. Maxi's warrantless arrest was supported by both probable cause and exigent circumstances. Detective Ogden could see a substantial quantity of drugs behind Mr. Maxi when Maxi opened the door, and Ogden had received a tip that several guns were also located somewhere in the unit. There was a risk that the evidence he saw would be destroyed if the police left the duplex to get an arrest warrant. And because the officers could not see inside the unit's other room, they did not know whether other people were in the unit. Mr. Maxi suggests that the police should have handcuffed him to the metal security gate or held him at gunpoint while they waited for an arrest warrant. We are not persuaded. As it was, Mr. Maxi was behind a locked metal gate, out of reach of the police. The officers had probable cause to believe Mr. Maxi committed a crime, and it was objectively reasonable for them to think exigent circumstances existed to justify their entry and arrest without a warrant. See id. at 1514–15.

E.  THE PROTECTIVE SWEEP AND WALK-THROUGH

Mr. Maxi also challenges what happened after the officers broke down the security gate and arrested him. More to the point, he argues that the officers' protective sweep and Lieutenant Almaguer's walk-through of the duplex were both unlawful. The government responds that even if the officers' actions after Mr. Maxi opened the door were illegal, the search warrant was adequately supported by an independent source.

19

"The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." Nix v. Williams, 467 U.S. 431, 443, 104 S. Ct. 2501, 2508 (1984).  We analyze whether an independent source exists to support a search warrant in two steps:

> First, we excise from the search warrant affidavit any information gained during the arguably illegal initial search and determine whether the remaining information is enough to support a probable cause finding.  Second, if the remaining information establishes probable cause, we determine whether the officer's decision to seek the warrant was prompted by what he had seen during the arguably illegal search.  If the officer would have sought the warrant even without the preceding illegal search, the evidence seized under the warrant is admissible.

United States v. Bush, 727 F.3d 1308, 1316 (11th Cir. 2013) (per curiam) (quotations and citations omitted, alterations adopted).

Even if the protective sweep and walk-through were illegal,[3] the evidence found inside the duplex is still admissible under the independent source doctrine. As discussed above, Mr. Maxi voluntarily opened the door.  As a result, Detective Ogden saw crack rocks and a bowl of packaged drugs five to ten feet behind Mr. Maxi.  Even excising any information learned by the officers after that moment, this

---

[3] Lieutenant Almageur's walk-through was particularly problematic.  The officers had already secured the duplex and knew that neither evidence nor officer safety were at risk.  And while Lieutenant Almaguer testified that his observations during the walk-through were not used in the search warrant affidavit, the record supports the Magistrate Judge's observation that this is somewhat hard to believe.  For example, the affidavit describes "several ledgers [containing] names, social security numbers, and the date of births of unknown persons" supposedly seen as part of a security sweep that lasted less than two minutes.  Even so, because of the independent source doctrine, we recognize that the remedy for this violation is not exclusion.

20

was sufficient to establish a finding of probable cause and to support the officers' decision to seek a search warrant. See id. Beyond that, there is no reason to believe (and Mr. Maxi does not argue otherwise) that the officers' decision to seek a warrant was prompted by what they saw during the protective sweep or the walk-through that followed. To the contrary, we are convinced the officers would have sought a warrant based on the drugs seen in plain view when Mr. Maxi opened the door. The evidence seized under the warrant is therefore admissible.

## F.  MR. MAXI'S STATEMENTS

Last, Mr. Maxi argues that his later statements to police should be excluded as fruit of the poisonous tree. Statements that are the fruit of an illegal search must be excluded. Wong Sun v. United States, 371 U.S. 471, 485, 83 S. Ct. 407, 416 (1963). But a statement is only excludable if it "derives [] immediately from an unlawful entry and an unauthorized arrest." Id. Because we have concluded that the constitutional violations of the officers did not cause Mr. Maxi to open the door, and an independent source of evidence supported Mr. Maxi's arrest once the door was open, his statements need not be excluded. In sum, we affirm the District Court's denial of Mr. Maxi's motion to suppress.

21

## IV.  MR. BLANC'S CLAIMS

Mr. Blanc makes two claims on appeal.  First, he argues that the District Court erred in admitting evidence gathered using wiretaps.  Second, he argues that the District Court erred in providing a jury instruction on flight.

A. THE WIRETAPS

Mr. Blanc argues that the District Court erred in not suppressing evidence from two wiretaps because the "necessity" requirement was not met. He says the government failed to exhaust other investigative methods and argues that surveillance, vehicle GPS tracking, or further use of confidential sources would have accomplished the same investigative goals as the wiretap.

The government affidavit in support of a wiretap must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. 2518(1)(c).  This "necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed."  United States v. Van Horn, 789 F.2d 1492, 1496 (11th Cir. 1986).  To show necessity, the "affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves."  Id.  The District Court's

22

determination that the government satisfied the necessity requirement for obtaining a wiretap is a finding of fact reviewed for clear error. United States v. Green, 40 F.3d 1167, 1172–73 (11th Cir. 1994).

The District Court did not clearly err in deciding that the government made an adequate showing of necessity. United States v. Green is instructive. In Green, this Court concluded that the necessity requirement was satisfied because "[t]he affidavit established that the procedure used to distribute the cocaine made it nearly impossible to determine the time and location of individual drug deliveries without knowing the content of the telephone calls. Moreover, the appellants' countersurveillance measures . . . made other investigative procedures unlikely to succeed or too dangerous." Id. at 1173. Many of the same facts were at play here. The affidavit stated that even after using search warrants, confidential sources, pen registers, and visual surveillance, law enforcement had not been able to track drug deliveries. It stated that further work with confidential informants or with undercover agents was unlikely to succeed because the organization was led by a small, tight-knit group. The affidavit stated that the conspirators were using countersurveillance and were wary of police surveillance. The alternative investigative measures proposed by Mr. Blanc do not defeat the affidavit's showing of necessity. A wiretap affidavit does not have to show that "every other imaginable method of investigation had been unsuccessfully attempted." United

23

States v. Alonso, 740 F.2d 862, 868 (11th Cir. 1984) (quotation omitted). On these facts, there was no clear error in refusing to suppress the fruits of the wiretaps.

Mr. Blanc also argues that the District Court erred in not suppressing evidence from the wiretaps because the affidavit omitted material facts and relied on affiants who intentionally or recklessly made material false statements. In particular, Mr. Blanc says it was error not to disclose that the confidential source was a former lieutenant in the drug organization and a lessee of one of the stash houses.

An application for a wiretap must be supported by probable cause. United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990). A wiretap is invalid if the supporting application contained deliberate false statements or misleading omissions, and without those statements or omissions, there would have been no probable cause. See United States v. Bascaro, 742 F.2d 1335, 1344 (11th Cir. 1984) (abrogated on other grounds by United States v. Lewis, 492 F.3d 1219, 1221–22 (11th Cir. 2007) (en banc)). "Omissions that are not reckless, but are instead negligent, or insignificant and immaterial, will not invalidate" the affidavit. Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997) (citation omitted).

Mr. Blanc fails to show that the omissions he identified were made intentionally or recklessly, or that if the identified additional information had been included, it would have undermined a finding of probable cause. We affirm the

24

District Court's decision denying Mr. Blanc's motion to suppress.

## B. THE JURY INSTRUCTION

At trial, the government requested that the jury be instructed on flight, relating to two separate incidents: (1) Mr. Blanc running from the truck when the police followed him back to the 132 NE 64th Street duplex where Mr. Maxi was arrested; and (2) Mr. Blanc running back into the building when the police executed a search warrant at 262 NW 52nd Street.  Mr. Blanc objected, but the court overruled his objection and gave the requested flight instruction.

We review a district court's decision to give a particular jury instruction for abuse of discretion.  United States v. Williams, 541 F.3d 1087, 1089 (11th Cir. 2008) (per curiam).  "Error in jury instructions does not constitute grounds for reversal unless there is a reasonable likelihood that it affected the defendant's substantial rights."  United States v. Wright, 392 F.3d 1269, 1277 (11th Cir. 2004).

"Evidence of flight is admissible to demonstrate consciousness of guilt and thereby guilt."  United States v. Blakey, 960 F.2d 996, 1000 (11th Cir. 1992).  The probative value of flight as evidence of guilt depends on four inferences: "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to

25

actual guilt of the crime charged." United States v. Myers, 550 F.2d 1036, 1049 (5th Cir. 1977).[4]

The District Court did not abuse its discretion in giving the flight instruction. In general, this Court has long upheld the use of a flight instruction. See United States v. Kennard, 472 F.3d 851, 854–55 (11th Cir. 2006); United States v. Borders, 693 F.2d 1318, 1327–28 (11th Cir. 1982). And in Mr. Blanc's specific case, the government put forward sufficient evidence to support the four inferences required by Myers. Two different officers testified that Mr. Blanc ran away from the police on two separate occasions. And on both occasions, he fled when police encountered him near stash houses that contained drugs, guns, and ammunition. Also, Mr. Blanc did not flee when his truck was pulled over and he was not in possession of drugs or guns. This evidence supports the giving of the jury instruction, and we conclude there is no reasonable likelihood that this instruction unfairly affected Mr. Blanc's substantial rights.

## V. CONCLUSION

We affirm the convictions of Mr. Maxi and Mr. Blanc in their entirety.

**AFFIRMED.**

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.