[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-11809

_____

UNITED STATES OF AMERICA,

                                                            Plaintiff-Appellee,

*versus*

JAMES LAMOUNT GRAHAM,
a.k.a.
JT Money,
a.k.a.
James Livingston,

                                                            Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 2:20-cr-00047-LGW-BWC-1

_____

Before GRANT, TJOFLAT, and ED CARNES, Circuit Judges.

GRANT, Circuit Judge:

A jury found James Graham guilty of various drug crimes. Now on appeal, Graham attacks his indictment, claiming that the grand jury's probable cause determination was rendered defective by the district court's special procedures related to the Covid-19 pandemic. Under these procedures, grand jurors met in three separate federal courthouses, but were joined together by videoconferencing. He also argues that the wiretaps used to gather evidence against him did not meet the statutory necessity requirement.

We affirm. The Covid-19 accommodations that Graham criticizes introduced no fundamental error into his prosecution; indeed, he does not claim that they affected the grand jury's decision in any way. As for the statutory necessity claim, the district court did not clearly err in deciding that the wiretaps were necessary.

**I.**

Graham's prosecution began in the summer of 2020, during the early stages of reopening during the Covid-19 pandemic. At that time, the Southern District of Georgia operated under a

standing order authorizing certain deviations from its normal grand jury procedures. The order permitted members of a single grand jury who would "otherwise travel into Savannah for grand jury service" to instead convene in three separate federal courthouses in the district in groups of ten or less.

The order imposed several requirements on these separated groups. To start, the "designated grand jury spaces in each U.S. Courthouse" were to be "connected using telecommunications facilities." Technology had to be in place such that "every member of the grand jury [could] both see and hear witnesses." For security, the order mandated that court security officers would be "posted outside the designated grand jury spaces at each U.S. Courthouse to safeguard the grand jury against intrusion by unauthorized persons and to ensure the secrecy of the grand jury's deliberations."

Graham was charged with multiple drug-related crimes. Before trial, Graham moved to dismiss the indictment based on a challenge to the grand jury's procedures. He also moved to suppress evidence that the government obtained using wiretaps of his telephone, claiming that the wiretaps were unnecessary and thus disallowed. The district court denied both motions.

A jury convicted Graham on all counts. The court sentenced him to 170 months of imprisonment and five years of supervised release and imposed other fines and assessments. Graham now appeals, reviving both his grand jury and evidentiary challenges.

## II.

We review the denial of a motion to dismiss an indictment for abuse of discretion, resolving issues of law de novo. *United States v. Cavallo*, 790 F.3d 1202, 1219 (11th Cir. 2015). We review the court's wiretap necessity finding for clear error. *United States v. Maxi*, 886 F.3d 1318, 1331 (11th Cir. 2018).

## III.

Graham argues that the standing order violated both his Fifth Amendment right to a grand jury and the restrictions set out in Federal Rule of Criminal Procedure 6(d). Rule 6(d)(1) offers a list of people—attorneys for the government, a witness who is on the stand being questioned, and the like—who "may be present while the grand jury is in session." Fed. R. Crim. P. 6(d)(1). Rule 6(d)(2) further restricts who "may be present while the grand jury is deliberating or voting." But Graham's concern is not who *was* present at the grand jury—it is who he says *was not*. He interprets Rule 6(d) to require that his grand jurors all be "present" in the same room, and he gestures at the cybersecurity risks of communicating with technology. Because the grand jurors were separated into three different courthouses, he says, his indictment was fundamentally corrupted.

But Graham's argument is missing one key component: prejudice. A showing of prejudice is generally required before an indictment may be dismissed because of a problem with the grand jury. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). After all, Rule 52(a) commands that courts disregard any "error,

defect, irregularity or variance which does not affect substantial rights." *Id.* at 254–55 (quoting Fed. R. Crim. P. 52(a)). In rare circumstances, such prejudice may be presumed—when "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair." *Id.* at 256–57. Such a "fundamental" error "gives rise to the constitutional right not to be tried" because "it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 802 (1989). The foremost examples of fundamental error are racial and gender discrimination in the selection of grand jurors. *See Bank of Nova Scotia*, 487 U.S. at 257.

When this sort of structural error is not at play, courts generally consider two things to evaluate potential prejudice: whether "it is established that the violation substantially influenced the grand jury's decision to indict" and whether there is "grave doubt that the decision to indict was free from the substantial influence of such violations."[1] *Id.* at 256 (quotations omitted); *see*

---

[1] One other test has also applied. In *Mechanik*, the Supreme Court confronted a post-trial denial of a challenge to a grand jury proceeding. *United States v. Mechanik*, 475 U.S. 66, 68–69 (1986). It held that the petit jury's later guilty verdict, by itself, showed that "any error in the grand jury proceeding" was "harmless beyond a reasonable doubt." *Id.* at 70. *Bank of Nova Scotia*, by contrast, restricts part of its analysis to cases in which "a court is asked to dismiss an indictment prior to the conclusion of the trial." 487 U.S. at 256. This Court has acknowledged some difficulty in squaring these two cases. *See United States v. Jennings*, 991 F.2d 725, 729 (11th Cir. 1993). We need not

*also Cavallo*, 790 F.3d at 1219; *United States v. Jennings*, 991 F.2d 725, 728–29 (11th Cir. 1993); *United States v. Exarhos*, 135 F.3d 723, 726–27 (11th Cir. 1998).

Graham falls far short of these standards. Even if he were correct that grand jurors must all be present in the same room to comply with Rule 6 (a question that we do not consider), that kind of violation of Rule 6 is not a fundamental error allowing for prejudice to be presumed. The fact that the grand jurors met in three secure locations and communicated via videoconference did not change the basic nature of Graham's grand jury or fatally infect his indictment. *See Bank of Nova Scotia*, 487 U.S. at 257–58 (finding no fundamental error despite many Rule 6 violations). It suggests no breach of secrecy, impartiality, or independence. *See Costello v. United States*, 350 U.S. 359, 362–63 (1956).

Graham thus must show prejudice, but at no point does he allege—or even speculate—how the violation he alleges could have affected his indictment. He claims no flaw in the presentation of evidence, no security breach, and no prosecutorial misconduct. Nor did he seek discovery about his grand jury proceedings. With no allegations—much less evidence—of any influence on the indictment, we cannot conclude that the grand jurors' physical separation "substantially influenced" their decision to indict or

---

consider that problem here because a petit jury convicted Graham on all counts, which means that *Mechanik*'s reasoning also supports our decision.

created "grave doubt" about the indictment's integrity. *See Bank of Nova Scotia*, 487 U.S. at 256.

No doubt, one can imagine how the use of telecommunication facilities *could* affect a grand jury in some way. But Graham must have been harmed by error in *his* grand jury or *his* indictment—hypotheticals will not do. Nothing in the record here suggests any prejudice to Graham. Nor do the briefs. So even if there were any error—and we are not suggesting that there was—it was harmless to Graham.

In short, the court did not abuse its discretion. Dismissal of an indictment is "an extreme sanction which should be infrequently utilized," and nothing about this grand jury proceeding supports dismissal. *United States v. Pabian*, 704 F.2d 1533, 1536 (11th Cir. 1983) (quotation omitted).

## IV.

When requesting a wiretap, the government must include in its application "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). But it need not "show a comprehensive exhaustion of all possible techniques." *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986). The law only demands an explanation of "the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves" for "this particular investigation." *Id.*; *United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011) (quotation omitted).

The district court did not clearly err in deciding that the government met this standard.  Graham argues that the wiretap cannot have been necessary because the government already obtained some evidence from surveilling a few of Graham's drug deals and that he was unlikely to reveal new information on the phone.  But if having some evidence of a crime were enough to bar a wiretap as unnecessary, no wiretap order could ever be issued because evidence is required to get a wiretap in the first place.  And in any event, the government's investigation expanded beyond just Graham's individual drug deals—it sought to uncover the inner workings of the whole drug trafficking organization.  The wiretaps could advance this broader goal.  *See Perez*, 661 F.3d at 581–82.

A review of the wiretap affidavits themselves shows that they provided more than enough explanation to comply with the law.  After describing the investigation's history and goals, the affidavits comprehensively outlined the "Need for Interception" and discussed "Alternative Investigative Techniques."  They exhaustively detailed why previous sources of information and reasonable alternative methods—including physical surveillance, cameras, interviews, undercover agents, subpoenas, search warrants, trash searches, and more—would not suffice.  Such thorough and specific affidavits easily satisfy the legal requirements.  *See United States v. Goldstein*, 989 F.3d 1178, 1195–96 (11th Cir. 2021).

## V.

We **AFFIRM**.