**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-12832

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

BILLY OLVERA,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:24-cr-20034-CMA-1

_____

Before ROSENBAUM, BRANCH, and ABUDU, Circuit Judges.

PER CURIAM:

Billy Olvera appeals his conviction for interference with flight crew members and attendants in violation of 49 U.S.C. § 46504. He argues that the district court erred in (1) overruling his

objection to the jury instruction that the government did not have to prove that he intended to intimidate the flight attendant; and (2) denying his motion for judgment of acquittal. After careful review, we affirm.

## I.    Background

A federal grand jury charged Olvera with intimidating and attempting to intimidate flight attendant A.G. while on an American Airlines flight on November 6, 2023, which interfered with the performance of A.G.'s duties, in violation of 49 U.S.C. § 46504. Olvera pleaded not guilty, and the case proceeded to trial.

At trial, the parties stipulated that, on November 6, 2023, Olvera was on board American Airlines flight 232 traveling from Dallas Fort Worth Airport to Miami International Airport, and that the aircraft was in flight in the special aircraft jurisdiction of the United States. A.G. then testified that she was one of four flight attendants on flight 232, and each flight attendant had different responsibilities and duties on the flight. A.G. was the only flight attendant assigned to work in the galley for the main cabin, which involved setting up the beverage service carts and serving refreshments. Her assignment required her to sit in a jump seat in the back of the plane. Prior to the flight, she learned that, among other law enforcement agents, there would be two Immigration and Customs Enforcement ("ICE") agents—one of whom was Olvera—escorting a passenger on the flight. She explained that these individuals are always seated in the last row of the plane, that the agents are armed, and that they typically introduce themselves

to the cockpit when boarding.  Olvera was assigned to middle seat 37E, but he sat in aisle seat 37D, and he put the passenger he was escorting in the middle seat.

A.G. first interacted with Olvera and the other agents after they boarded the plane because they did not stop to introduce themselves to the cockpit crew, so she spoke with them about introducing themselves.  She then interacted with Olvera again when she helped him access the plane's WiFi, and again after take-off when she checked to make sure that he had successfully connected to the WiFi.  During the flight, Olvera positioned himself with his shoulder and leg in the aisle area, which caused A.G. to have to brush up against him when she passed through the aisle, but she thought that he positioned himself this way because he was tall and needed more room.  A.G. also noticed Olvera "looking over his shoulder" a few times toward the galley area, but she thought that he was just trying to ensure that he was out of the way because the flight attendants were frequently going up and down the aisles.

When A.G. began beverage cart service, Olvera asked her for cookies.  A.G. did not have any on her cart, but she told him that she would get some from another cart and bring them back to him.  During service, A.G. returned to the galley for more coffee and noticed as she walked back by that Olvera had his armrest up and his phone laying by his thigh area with the camera facing upwards.  Later, Olvera called her over and asked her about the cookies again.  However, he was talking very softly, and A.G. had

to lean in closer and squat down to hear him. As she leaned down, she saw his phone out in the aisle by his thigh "with the camera facing up, very close to [her]," about "an inch and a half away from [her] knees," "almost like he [was] trying to get underneath [her] dress." A.G. looked up at him and, in response, Olvera "took his phone and slid it up against his thigh and up to his chest" so that the screen was hidden from her view. His actions caused "bells and whistles" to go off in A.G.'s head and made her think that perhaps Olvera had been "trying to record underneath [her] dress" the entire time.

A.G. retrieved the cookies, but she handed them to Olvera from behind his seat so that she was out of sight of any camera. She then returned to the galley area and waited for another flight attendant to come back to the galley. When flight attendant L.A. entered the galley, A.G. told her about her suspicions, and they devised a plan. A.G. would walk back down the aisle and go retrieve something for L.A., and L.A. would record A.G. walking down the aisle and capture Olvera's actions. They executed the plan, and as A.G. passed by, Olvera pulled out a second cell phone, slid it underneath his tray table, opened the camera app, and took pictures and videos of A.G.

L.A.'s video was played for the jury. The video established that as A.G. walked into the aisle, Olvera immediately stopped watching a movie to stare at her as she walked. Olvera moved a second phone in between his legs. With the armrest up, Olvera then moved the phone to his hand closest to the aisle and held his

hand down by his legs, angling the phone upwards. He then covertly recorded A.G. as she returned down the aisle to the galley.

A.G. testified that, after receiving confirmation that Olvera was in fact recording her, she felt "extremely enraged" and "violated," noting that she "couldn't believe it was happening to [her]" and that she "couldn't run" and was "stuck in a metal tube, 36,000 feet up in the air." She also felt "helpless," sick to her stomach, and that her privacy had been violated. She realized that, when he had been looking over his shoulder earlier, it was probably so that he could watch for her to enter the aisle and get his phone ready.

A.G. explained that she had experience dealing with unruly passengers, drunk passengers, passengers who were enamored with her, and even violent passengers. In those situations, she would generally confront the passenger about the issues and try to de-escalate the situation or take other necessary actions. However, she decided to not confront Olvera because she was concerned about the consequences of doing so given that he was armed.

After viewing L.A.'s recording, she and L.A. informed the captain and the rest of the crew about Olvera's actions. The captain instructed A.G. not to go back out in the aisle or do any other duties and just to stay in the back with L.A. A.G. complied

and did not perform any of her remaining duties for that flight.[1] The captain later told her that law enforcement would be meeting them in Miami when the plane landed and instructed A.G. to switch jump seats with one of the male flight attendants who was stationed in another part of the plane. In her ten years of being a flight attendant, A.G. had never switched jump seats mid-flight prior to this incident. Before she could switch seats, however, Olvera escorted his passenger to the plane's bathroom, which was adjacent to the galley. While waiting outside for his passenger, he "star[ed] in [A.G.'s] direction" and commented that he noticed she had switched into flat shoes, and that he "prefer[red] [her] heels." Olvera's comment upset A.G.

After the plane landed, police seized Olvera's two cell phones and obtained a search warrant. A forensic examination of the phones revealed 23 photos and 20 videos of A.G. that Olvera had taken on the plane. Many of the photos and videos consisted of images of A.G.'s backside while she was walking, sitting, and performing her cart services (angled many times in a way that suggested Olvera was trying to view up her skirt). The photos and videos were shown to the jury.

After the government rested, Olvera moved for a judgment of acquittal, arguing that the government failed to present sufficient evidence that A.G. was intimidated, and that Olvera

---

[1] A.G. was also supposed to continue on additional flights because she was on a four-day trip schedule, but she was pulled off of those flights as well after the incident with Olvera.

24-12832                Opinion of the Court                7

interfered with the performance of her duties.  The court denied the motion without explanation.  Olvera did not present any witnesses or evidence.

As relevant here, the pattern jury instruction for the offense provided that a jury could find a defendant guilty of violating the statute in question only if the government proved the following beyond a reasonable doubt:

(1) the Defendant was on an aircraft in flight in the United States;

(2) the Defendant knowingly intimidated or attempted to intimidate a flight attendant of the aircraft; and

(3) the intimidation interfered with or lessened the ability of the flight attendant to perform her duties.

The instruction defined intimidate as follows:

To "intimidate" someone is to intentionally say or do something that would cause a person of ordinary sensibilities to fear bodily harm.  It's also to say or do something to make another person fearful or make that person refrain from doing something that the person would otherwise do—or do something that the person would otherwise not do.

The government proposed adding the following language to the pattern jury instruction:  "The Government does not have to prove that the Defendant intended to intimidate the flight attendant or

8                    Opinion of the Court                    24-12832

intended to interfere with her performance of her duties. *United States v. Grossman*, 131 F.3d 1449 (11th Cir. 1997)."

Olvera objected, arguing that *Grossman* was decided prior to the creation of the pattern jury instruction for this offense, and "although *Grossman* held that [§] 46504 [was] not a specific intent crime"—which was consistent with the first definition of intimidation in the pattern jury instruction—"the alternative definition for intimidation in the pattern jury instruction implie[d] otherwise." Thus, he argued that "[t]he [g]overnment should be required to prove that [Olvera] had the specific intent to intimidate A.G." The government in turn argued that *Grossman* was still good law and established that § 46504 was a general intent crime. The government maintained that its proposed addition to the instruction was necessary because Olvera had made his intent to intimidate a focus of his defense. Thus, it was "crucial" for the government to make clear to the jury that Olvera did not have to "intend to intimidate [A.G.]." Rather, all the government had to show was that his actions were knowing (*i.e.*, his actions were not a mistake or accident), and that A.G. was intimidated by those actions.

The district court noted Olvera's objection and granted the government's proposed addition. Accordingly, the district court instructed the jury that:

> The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt. One, the Defendant was on an

aircraft in flight in the United States. Two, the Defendant knowingly intimidated or attempted to intimidate a flight attendant of the aircraft. And three, the intimidation interfered with or lessened the ability of the flight attendant to perform her duties.

. . . .

To intimidate someone is to intentionally say or do something that would cause a person of ordinary sensibilities to fear bodily harm. It is also to say or do something to make another person fearful or make that person refrain from doing something that the person would otherwise do or do something that the person would otherwise not do.

The Government does not have to prove that the Defendant acted with the intent to intimidate the flight attendant or acted with the intent to interfere with her performance of her duties.

The district court also included the pattern jury instruction for "knowingly," and instructed the jury that "knowingly means that an act was done voluntarily and intentionally and not because of a mistake or by accident."

During deliberations, the jury sent the court a note stating the following:

We need further clarification:

Is it that "knowingly" means "he knows that she knows what he is doing," or

"He knows what he is doing (such as recording)."

The district court instructed the jury to "[p]lease review [the] [i]nstructions to you on the law and rely on your recollection of the testimony and evidence presented. . . ." The jury convicted Olvera as charged.

Olvera filed a renewed motion for judgment of acquittal, arguing that even if § 46504 was a general intent crime, in order for him to "knowingly" violate § 46504, he must have been aware that A.G. was in fact intimidated by him. He asserted that this element was not satisfied because the evidence established that, at all times, Olvera "acted surreptitiously so as not to get caught" and at no time did A.G. make him aware that she knew of "his clandestine video voyeurism."

The district court denied the motion, explaining that Olvera's interpretation of § 46504 as requiring the government to show that he knew that he was intimidating A.G., was contrary to this Court's interpretation of *Grossman* and this Court's interpretation of similar statutes in other cases. Regardless, the district court concluded that even if it accepted Olvera's interpretation, a reasonable jury could have found that Olvera was aware that A.G. was in fact intimidated by him, citing inferences the jury could have drawn from the fact that the incident occurred "in the close quarters" of a plane, that A.G. noticed Olvera taking photographs, and that A.G. "abruptly disappeared from [Olvera's]

vicinity . . . . abandoning her zone of duty." Olvera was sentenced to two years' probation. This appeal followed.

## II.    Discussion

Olvera argues that the district court erred in (1) overruling his objection and instructing the jury that the government did not have to prove that he intended to intimidate the flight attendant; and (2) denying his motion for judgment of acquittal. We address each argument in turn.

### A. *The jury instruction*

Olvera argues that the district court erred in overruling his objection to the government's proposed jury instruction and instructing the jury that the government did not have to prove that he intended to intimidate Olvera. Specifically, he maintains that the pattern jury instruction defines "intimidate" in two separate ways—one of which focuses on the defendant "intentionally saying something [that] makes a person of ordinary sensibilities fear bodily harm," and the second which focuses on the defendant "saying or doing something which makes another person fearful or make[s] the person refrain from doing something." (emphasis omitted). He maintains that only the second definition of intimidate applied to his case because there was no evidence that he said anything to A.G. that caused her to fear bodily harm, and this definition "implie[s] a specific intent to intimidate," and is supported by the Supreme Court's decision in *Elonis v. United*

*States*, 575 U.S. 723 (2015).[2]  Accordingly, he maintains that the government's instruction given to the jury—that the government did not have to prove that Olvera acted with the intent to intimidate A.G. or acted with the intent to interfere with her performance of her duties—was confusing, lessened the government's burden of proof, and casts "significant doubt" on the jury's deliberations.

"[W]e review *de novo* issues about whether the content of instructions that were given are correct statements of law," *United States v. Hill*, 643 F.3d 807, 850 (11th Cir. 2011), but "[w]e defer to the district court on questions of phrasing absent an abuse of discretion," *United States v. Carter*, 776 F.3d 1309, 1323 n.11 (11th Cir. 2015).

> Generally, district courts have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts, and we will not reverse a conviction on the basis of a jury charge unless the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process.

*United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (quotations omitted); *see also United States v. Maxi*, 886 F.3d 1318, 1332 (11th Cir. 2018) ("Error in jury instructions does not

---

[2] In his reply brief, Olvera reverses course and denies that he is making a specific intent argument.  But it is clear from his initial brief that he is in fact making a specific intent argument.  Therefore, we address it.

constitute grounds for reversal unless there is a reasonable likelihood that it affected the defendant's substantial rights." (quotations omitted)). In other words, "[w]hen the jury instructions, taken together, accurately express the law applicable to the case without confusing or prejudicing the jury, there is no reason for reversal even though isolated clauses may, in fact, be confusing, technically imperfect, or otherwise subject to criticism." *United States v. Beasley*, 72 F.3d 1518, 1525 (11th Cir. 1996).

The interference with a flight attendant statute provides that:

> An individual on an aircraft in the special aircraft jurisdiction of the United States who, by assaulting or intimidating a flight crew member or flight attendant of the aircraft, interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties, or attempts or conspires to do such an act, shall be fined under title 18, imprisoned for not more than 20 years, or both. . . .

49 U.S.C. § 46504. In *Grossman*, we rejected the defendant's argument that the government was required to prove that "he intentionally and willfully" violated this statute. 131 F.3d at 1451–52. We first noted that there was "[n]o specific intent element . . . apparent on the face of the statute." *Id.* at 1451. Next, we explained that Congress enacted § 46504 to replace § 1472(j), which was a general intent crime that had "prohibited assaulting, intimidating,

14                    Opinion of the Court                    24-12832

or threatening any crew member or flight attendant so as to interfere with the performance by such member or attendant of his duties or lessen the ability of such member or attendant to perform his duties." *Id.* (quotations omitted). We then emphasized that "[t]here [was] no indication of any congressional intent to change the meaning of the statutory language as it relates to [intent]," and that this conclusion was consistent with several of our sister circuits. *Id.* at 1451–52. Accordingly, "[b]ased on the plain language of the statute and the decisions of our sister circuits, we [held] that § 46504 does not require any showing of specific intent." *Id.* at 1452.[3] Nevertheless, "[a]s a general intent crime, the government must still prove that the defendant knowingly engaged in the conduct prohibited by [the statute]." *United States v. Knight*, 490 F.3d 1268, 1271 (11th Cir. 2007).

Post-*Grossman*, the jury instruction committee created a pattern instruction for § 46504. The pattern instruction provides as follows:

> It's a Federal crime to [assault] [intimidate] a flight-crew member or attendant on an aircraft in flight in the United States.
>
> The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

---

[3] We note that *Grossman* is our only decision interpreting § 46504.

(1) the Defendant was on an aircraft in flight in the United States;

(2) the Defendant knowingly [assaulted] [intimidated] a flight-crew member or flight attendant of the aircraft; and

(3) the [assault] [intimidation] interfered with or lessened the ability of the crew member or flight attendant to perform [his] [her] duties.

. . . .

[To "intimidate" someone is to intentionally say or do something that would cause a person of ordinary sensibilities to fear bodily harm. It's also to say or do something to make another person fearful or make that person refrain from doing something that the person would otherwise do—or do something that the person would otherwise not do.]

*See* Eleventh Circuit Pattern Jury Instructions (Criminal Cases) O118.[4]

Notwithstanding the plain language of the statute and our decision in *Grossman*, Olvera contends that the operative verb "make" in the phrase "make another person fearful or make that

---

[4] We note that the comments to the pattern instruction cite to *Grossman* and expressly state that "[t]his statute does not require any showing of specific intent." Eleventh Circuit Pattern Jury Instructions (Criminal Cases), cmt., O118.

person refrain from doing something" implies a specific intent to intimidate. Furthermore, he maintains that his interpretation is consistent with the Supreme Court's decision in *Elonis v. United States*, 575 U.S. 723 (2015). We disagree.

First, even assuming arguendo that the verb "make" in the pattern instruction implies a specific intent, pattern jury instructions "are not binding" and "Eleventh Circuit case law takes precedence." *United States v. Dohan*, 508 F.3d 989, 994 (11th Cir. 2007). Thus, to the extent there is any tension between the language of the pattern instruction and our holding in *Grossman* that § 46504 is a general intent crime, *Grossman* controls. *Id.*; *see also United States v. Ettinger*, 344 F.3d 1149, 1158 (11th Cir. 2003) ("Our pattern instructions are not precedent and cannot solely foreclose the construction of the necessary elements of a crime as stated in the statute.").

Second, the Supreme Court's decision in *Elonis* has no bearing on the interpretation of § 46504. In *Elonis*, the Supreme Court examined 18 U.S.C. § 875(c), which criminalizes transmitting in interstate commerce "any communication containing any threat . . . to injure the person of another." 575 U.S. at 726. The statute did not define any required mental state on the part of the defendant. *Id.* at 732. The Supreme Court explained that "[w]hen interpreting federal criminal statutes that are silent on the required mental state, [it] read[s] into the statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct." *Id.* at 736 (quotations omitted).

Thus, the Court cautioned that "[i]n some cases, a general requirement that a defendant act knowingly is itself an adequate safeguard" to separate wrongful conduct from otherwise innocent conduct. *Id.* "In other instances, however, requiring only that the defendant act knowingly would fail to protect the innocent actor." *Id.* at 737. The Supreme Court concluded that § 875(c) was the latter type of statute because "the crucial element separating legal innocence from wrongful conduct [in § 875(c) was] the threatening nature of the communication." *Id.* Accordingly, the Court held that to be criminally culpable under § 875(c), the defendant had to know both that he was transmitting a communication, and that the communication contained a threat. *Id.* at 737–38.

*Elonis* does not help Olvera. First, *Elonis* interpreted a different statute with elements that are not similar to the elements of § 46504. *Id.* at 732. Second, *Elonis* recognized that, "[i]n some cases, a general requirement that a defendant act knowingly is itself an adequate safeguard" to separate wrongful conduct from otherwise innocent conduct. *Id.* at 737. Section 46504 is such a statute. Specifically, § 46504 prohibits "assaulting or intimidating a flight crew member or flight attendant of the aircraft" in a way that "interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties." 49 U.S.C. § 46504. "As a general intent crime, the government must . . . prove that the defendant knowingly engaged in the conduct prohibited by [the statute]." *Knight*, 490 F.3d at 1271. The general requirement that the defendant acted knowingly ensures that the defendant is not held

criminally liable for acts that were committed accidentally or by mistake. Thus, the general intent requirement that the defendant act "knowingly" in § 46504 is an adequate safeguard to separate wrongful conduct from otherwise innocent conduct. No additional *mens rea* is required. Accordingly, our conclusion in *Grossman* is in fact consistent with *Elonis*'s reasoning. *See United States v. Lynch*, 881 F.3d 812, 816 (10th Cir. 2018) (holding that that "[a] general intent reading of § 46504, which still requires that a defendant's conduct be voluntary and deliberate, readily satisfies *Elonis*'[s] *mens rea* standard.").

Regardless, even assuming arguendo that there is tension between *Elonis* and *Grossman*, under our prior panel precedent rule, we remain bound by *Grossman*. "[A] prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008)). "An intervening Supreme Court decision abrogates our precedent only if the intervening decision is both clearly on point and clearly contrary to our earlier decision. If the Supreme Court never discussed our precedent and did not otherwise comment on the precise issue before the prior panel, our precedent remains binding." *United States v. Dubois*, 139 F.4th 887, 892–93 (11th Cir. 2025) (quotations and citation omitted). *Elonis* is not "clearly on point" nor is it "clearly contrary" to *Grossman*. Accordingly, *Grossman* controls.

In light of the above, the instruction that "[t]he Government does not have to prove that the Defendant acted with the intent to intimidate the flight attendant or acted with the intent to interfere with her performance of her duties" is a correct statement of law. *See Grossman*, 131 F.3d at 1451–52.  Further, because the district court's instructions required the jury to find that Olvera acted knowingly, which is consistent with § 46504's general intent requirement, it did not lessen the government's burden of proof. Thus, taken together, the jury instructions accurately stated the law, and there is no basis for reversal.  *Beasley*, 72 F.3d at 1525.

## B.  Motion for judgment of acquittal

Olvera argues that the district court erred in denying his motion for a judgment of acquittal because there was no evidence that he was aware that his conduct was intimidating A.G. or that A.G. even knew about his conduct.   He maintains that his "wrongdoing must be conscious to be criminal," and he emphasizes that he made the videos surreptitiously and did not know that anyone knew what he was doing.

We review "the denial of a . . . motion for judgment of acquittal *de novo*." *United States v. Chafin*, 808 F.3d 1263, 1268 (11th Cir. 2015).  In doing so, "[w]e examine the evidence in the light most favorable to the government and resolv[e] all reasonable inferences and credibility issues in favor of the guilty verdicts." *Id.* (quotations omitted).  "We will not overturn a jury's verdict if there is any reasonable construction of the evidence that would have allowed the jury to find the defendant guilty beyond a

reasonable doubt." *United States v. Clay*, 832 F.3d 1259, 1294 (11th Cir. 2016) (quotations omitted).

Contrary to Olvera's argument, the government was not required to prove that he was subjectively aware that he was intimidating A.G.  There is no subjective knowledge of intimidation by the defendant requirement in the plain language of the statute.  *See* 49 U.S.C. § 46504 ("An individual on an aircraft in the special aircraft jurisdiction of the United States who, by . . . intimidating a . . . flight attendant . . ., interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties . . . shall be fined under title 18, imprisoned for not more than 20 years, or both.").  Rather, as discussed above, all that is required to be criminally culpable under § 46504 is that the defendant knowingly engaged in certain speech or conduct that intimidated a flight attendant in a manner that interfered with the performance of the attendant's duties.

Viewing the evidence and all reasonable inferences in the light most favorable to the government, there was more than sufficient evidence that would have allowed the jury to find Olvera guilty of violating § 46504 beyond a reasonable doubt.  For instance, the evidence demonstrated that Olvera was on an aircraft in the jurisdiction of the United States when he knowingly switched his assigned middle seat to an aisle seat.  He then knowingly and surreptitiously held his cell phone down by his legs in order to capture multiple photos and videos of flight attendant

A.G.'s skirt, legs, and backside as she walked up and down the aisle. Plus, when A.G. looked at Olvera in response to seeing his phone sitting facing up by his thigh as he spoke softly to get her to lean into him, Olvera reacted by taking "his phone and slid[ing] it up against his thigh and up to his chest" so that the screen was hidden from her view. A reasonable jury could have understood that conduct as Olvera's recognition that A.G. knew what he was up to. And the jury could have reasonably inferred that Olvera's conduct intimidated A.G. and interfered with her duties as a flight attendant based on her testimony regarding how she felt when she discovered what was happening and the actions she took in response to the discovery. Accordingly, the government presented sufficient evidence from which a jury could have found beyond a reasonable doubt that Olvera knowingly engaged in conduct that violated § 46504. Consequently, the district court did not err in denying the motion for judgment of acquittal. *Clay*, 832 F.3d at 1294.

### III.  Conclusion

For the above reasons, we affirm Olvera's conviction.

**AFFIRMED.**